ANGELA L. MILLER, Indiv. and as Independent Ex'x of the Estate of Darrin R. Miller, Deceased, Plaintiffs-Appellants, v. RINKER BOAT COMPANY, INC., Defendant-Appellee.

Fourth District   No. 4—03—0541

Opinion filed September 15, 2004.

Brett K. Gorman (argued), of Schmiedeskamp, Robertson, Neu & Mitchell, of Quincy, for appellant.

Karen L. Kendall (argued), of Heyl, Royster, Voelker & Allen, of Peoria, and Frederick P. Velde and Matthew R. Booker, both of Heyl, Royster, Voelker & Allen, both of Springfield, for appellee.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In July 2000, plaintiffs, Angela L. Miller (hereinafter plaintiff), filed a complaint individually and as executrix of her deceased

husband's estate against defendant, Rinker Boat Company, Inc., an Indiana corporation, alleging wrongful death of her husband, Darrin R. Miller (decedent), based on strict liability and negligence. In October 2002, defendant filed a motion for summary judgment. In January 2003, after a hearing on the motion, the trial court granted summary judgment for defendant. Plaintiff appeals, arguing (1) in granting summary judgment to defendant on the strict-liability count, the court erred in concluding that plaintiff has not sufficiently demonstrated the existence of a design defect that made the boat unreasonably dangerous; (2) the court erred in finding defendant owed no duty to warn, or, in the alternative, defendant provided adequate warning as a matter of law; and (3) in granting summary judgment to defendant on the negligence count, the court erred in concluding that plaintiff failed to present any evidence to support any breaches of duty by defendant and failed to prove defendant's breaches, if any, proximately caused decedent's death. We reverse and remand.

## I. BACKGROUND

### A. Procedural Background

On July 24, plaintiff filed a wrongful-death complaint against defendant based on a strict-liability theory and also a negligence theory. Specifically, plaintiff claimed that the boat in question had the following defects:

(1) The boat had slippery surfaces in locations utilized by passengers for ingress to and egress from the passenger compartment;

(2) the boat had no antiskid surface along the rear in a location that passengers had to stand on and cross for ingress to and egress from the passenger area; and

(3) the boat contained no markings, warnings, or instructions to discourage and prevent passengers from standing on the slippery surfaces described above.

On October 21, 2002, defendant moved for summary judgment, arguing as follows:

(1) Under the strict-liability count,

(a) plaintiff did not sufficiently prove that defendant manufactured a boat that was defective or unreasonably dangerous, and

(b) defendant had no duty to warn because plaintiff complains about a danger that is open and obvious, and, in any event, defendant provided adequate warning in the instructional manual;

(2) under the negligence count,

(a) plaintiff failed to demonstrate that defendant breached its duty of care to decedent, and

(b) defendant owed no duty to warn, or defendant provided adequate warning in the instruction manual.

Defendant attached to its memorandum of law in support of its motion for summary judgment a photocopied picture of the Rinker 232 Captiva Cuddy boat and the Rinker owner's manual for Cuddy Cabin boats.

On November 21, 2002, plaintiff filed a response to defendant's motion for summary judgment and a memorandum of law opposing summary judgment. Plaintiff attached to her memorandum of law the following: (1) plaintiff's deposition, (2) Randy Rinker's deposition, (3) Angela Walker's deposition, (4) Robert "Whitey" Walker's deposition, (5) Todd Miller's deposition, (6) James Allen's deposition, (7) Lloyd Standridge's deposition, (8) Dr. Travis Hindman's deposition, (9) Dr. Christopher Long's deposition, (10) Kim Slocum's deposition, (11) Robert Dumford's deposition, (12) Christian Von Der Hyde's deposition, (13) U.S. Paint Company's (U.S. Paint) instructions for mixing sand-and-paint mixture, (14) a Rinker owner's manual, and (15) Tom Richardson's deposition. Plaintiff's memorandum of law in opposition to the motion for summary judgment and the attachments thereto set forth the following evidence.

### 1. *The Incident*

This suit arose from a drowning incident that occurred on August 30, 1998, on the Mississippi River. On July 17, 1998, decedent purchased a 1998 Model 232 Captiva Cuddy motorboat from the Great Lakes Boat Company (Great Lakes) in Hamilton, Illinois. Defendant manufactured the boat, and Great Lakes is an authorized dealer for defendant. Decedent's family members testified that this is the first boat that decedent personally owned. Decedent, however, was raised around the boats that his family owned and was familiar with boating on the Mississippi River.

On August 30, 1998, after owning the boat for over six weeks, decedent took plaintiff and three friends (Kent Sawyer, who died shortly thereafter, Angela Walker, and Whitey) out on the Mississippi River to go to an annual boat festival on Hog's Back Island. Plaintiff stated that they left at about 11 a.m. from a public boat ramp in Warsaw, Illinois, which is about 10 miles away from her home in Hamilton, Illinois. Whitey stated that Hog's Back Island is just north of Quincy, Illinois, and is about 30 miles away from Warsaw. When the group arrived at the island, the shore was already full of boats. They anchored behind other boats out in the water and stayed there for about three to four hours.

Plaintiff and Whitey testified that the group brought with them a cooler of beer and soft drinks and part of a bottle of Crown Royal.

They estimated the cooler contained about a case or a case and a half of beer. Whitey also stated the bottle of Crown Royal was about one-quarter full. Everyone drank beer except Angela Walker, who was pregnant at the time. Angela Walker and Whitey testified that decedent, plaintiff, Kent, and Whitey each drank about the same amount of beer. The group did not drink the Crown Royal until they were on their way home. Whitey stated that decedent, Kent, and he "probably had about two [Crown Royals] a piece [sic]" and finished what was left in the bottle. Whitey further estimated that "over the course of the day" he drank "somewhere between seven to nine" drinks, and decedent drank "probably the same amount." No one is certain, however, how many beers were left in the cooler and exactly how much and what decedent drank.

At about 4:30 p.m., the group decided to leave Hog's Back Island. On the way home, decedent wanted to go tubing. To prepare for tubing, decedent and Kent removed the tube, pump, rope, and other necessary items from the boat's storage area. Whitey and Angela Walker testified that, while Kent was blowing up the tube, decedent stepped onto the engine-cover area (transom) from the rear bench seat with ropes in his hand, preparing to tie the tube to the back of the boat. Whitey stated he was standing, facing decedent, when decedent was stepping up to the rear deck. As Whitey was turning away from decedent (from the stern side to the port side of the boat) to get into the driver's seat, he heard a "squeak" and saw decedent's feet "in the corner of my eye slide up to this [port side] direction." Whitey admitted that he only "caught the motion of [decedent's] one foot in the air" and he did not see decedent fall. Whitey then heard one hard "thump," and he immediately stood up on the bench seat and looked at the water to see if decedent was okay. Whitey stated he initially thought decedent might be "goofing off," but at the same time, he was also "a little concerned" because of "how hard the thump was on the back of the boat."

Angela Walker stated that she also did not see decedent fall because she was watching Kent blow up the tube. Angela Walker stated that she heard a "thump" and a "splash." Angela Walker did not know the source of the sound, but she immediately "stood up" to see "what was going on," and she saw decedent's body "already under the water." Angela Walker recalled that decedent was "face up *** lying parallel with the stern of the boat," and then he "just went down" under the water. Angela Walker stated that when decedent's body did not resurface, everyone started yelling for decedent to "come back" and "quit messing with us." Angela Walker and Whitey recalled that in "probably less than five seconds," Kent jumped into the water to

look for decedent. Whitey then jumped into the water to help Kent. Soon after, plaintiff also jumped in. Angela Walker described plaintiff as "hysterical," crying for help while floating in the water. Angela Walker jumped into the water soon after "to get a life jacket to [plaintiff] cause [sic] [she] knew [plaintiff's] state was already going to start deteriorating real quick."

Plaintiff testified that she witnessed the entire slip and fall. She stated she was sitting in the chair next to the driver's seat, and, as decedent was preparing to tie the rope to the back of the boat, she swivelled around to watch decedent. Plaintiff stated that she watched her husband because she wanted to go home and was not happy with his decision to go tubing. Plaintiff saw decedent step from the floor of the boat onto the rear bench with his right foot, then onto the transom with his left foot. Plaintiff did not recall whether decedent had anything in his hands. After decedent stepped on the transom, he took another step with his right foot into the rear starboard stern corner. At that time, plaintiff saw decedent's right foot "just come right out from underneath of him" and his legs "just went up in the air." Plaintiff stated that she remembered decedent's back "went down" from the side and decedent's head was "like snapped." Plaintiff heard "a big[,] loud thud" and "felt it when [decedent] hit," and then decedent was out of her sight. Plaintiff stated that she "jumped up immediately" and yelled, "he hit his head." Kent initially said, "Oh, he probably is just messing with us," but everyone looked over in the water, and they did not see anything. Plaintiff told Kent again that decedent hit his head, and Kent "dove right in" to search for decedent. Within seconds, plaintiff and the other passengers also jumped into the water to search for decedent. Plaintiff testified that they could not find decedent and eventually Kent and Whitey pulled plaintiff out of the water.

Lloyd Standridge, captain of a towboat, witnessed the accident as it happened. Standridge testified that on August 30, 1998, he and his towboat were northbound on the Mississippi River. Standridge stated that the weather was pretty on that day and pleasure boats were all over the river. Sometime between 6 and 7 p.m., Standridge noticed a pleasure boat about 200 yards away with "two guys and two girls" on board. Standridge slowed his boat down, got his binoculars out, and "eased on by them" to "check out the girls." Standridge stated that the pleasure boat passed by his towboat on the starboard side, then turned and stopped, and was "more or less drifting" at about 30 yards away.

Standridge stated that as he was watching the girls, he noticed three people facing each other talking while a male "stood up and stepped down on the platform." Standridge testified that as the male

"raised his left foot up" to step from the platform to the boat's ladder, "his other foot just went out from under him." Standridge saw the male hit the ladder, which was already in the water, with the back of his neck or head. The male did not make a splash and went straight down. Standridge thought to himself, "God, he hit hard," but "the other three people" on the boat "weren't paying any attention" to what happened and "kept on talking." Standridge believed that at the time of accident, the male did not have a life jacket on and was barefoot. In addition, none of the passengers on board wore life jackets.

When the male did not come up from the water, Standridge got worried and started hollering at the people on the boat and pointing toward the water. Standridge stated that, initially, the people on the pleasure boat could not hear him and "must [have] thought I was crazy." But then the passengers must have realized the situation was serious because "their eyes got big" and they "started walking around [and] looking around." Standridge stopped his towboat to make sure he could mark the spot where the male fell in. He then called the Coast Guard to stop all towing traffic and to notify Search and Rescue. Standridge stated that, as he was talking to the Coast Guard about what had happened, the people on the pleasure boat were "all over the place going crazy looking for [the male]."

Standridge stated that the Coast Guard requested him to get one of the passengers to come to his towboat so that the Coast Guard could get information about the person that had fallen into the water. Standridge sent two of his crew to the pleasure boat, and they brought a male passenger (Kent) back to the towboat. Standridge noticed that the passenger was "emotionally distraught" and "completely confused." Standridge stated that he smelled alcohol from the passenger's breath but the passenger was not "staggering drunk." Standridge stayed at the scene to assist the search effort until it was dark.

Plaintiff testified that after she got out of the water, she sat on the boat, crying and screaming, knowing decedent "was gone." Plaintiff then asked Whitey to inform decedent's parents and brothers about the drowning. Later that afternoon, the Missouri Water Patrol and the Illinois Conservation Department arrived at the scene to search for decedent and to investigate the incident. No one was able to find decedent. Two days later, decedent's body washed up on shore, and a coroner's report was prepared pursuant to the request of the coroner of Adams County.

### 2. *Decedent's Autopsy*

Dr. Travis Hindman, a forensic pathologist, testified to the results of decedent's autopsy. Dr. Hindman stated that the cause of decedent's

death was "drowning." Dr. Hindman found a laceration on the left side of decedent's face but no evidence of significant trauma. Dr. Hindman stated that he could not determine the cause of the laceration. Dr. Hindman also testified that at time of the autopsy, decedent's blood-alcohol level was .185. Dr. Hindman stated that because of the decomposition, he was not able to obtain "vitreous humor," a transparent jelly that fills the eyeball posterior to the lens, from decedent's body. As a result, he was not able to compare decedent's vitreous-alcohol level to decedent's blood-alcohol level. Dr. Hindman therefore stated that he could not determine decedent's blood-alcohol level immediately before his death because "there is an unpredictable rate of production by organisms acting upon the decedent's body tissues and fluids" that would increase decedent's blood-alcohol level. Dr. Hindman further stated that in some individuals, postmortem decomposition could contribute up to 0.2 of the blood alcohol.

Dr. Christopher Long, a forensic toxicologist and one of plaintiff's expert witnesses, also testified to the cause of the decedent's blood-alcohol level. Dr. Long agreed with Dr. Hindman that the .185 postmortem blood-alcohol level is not indicative of any amount of alcohol decedent consumed prior to the time of his death. In addition, based on the description of decedent's decomposition in the autopsy, "it is quite reasonable that [.185] alcohols [sic] are generated strictly from decomposition."

### 3. Defendant's Manufacturing Process

Kim Slocum, defendant's general manager, and Robert Dumford, defendant's plant manager, testified that defendant manufactured the boat in question in October 1997 at its Indiana plant. Dumford stated that defendant intended its boats to be used on the waterways for tubing and skiing. Slocum and Dumford stated that defendant uses a two-step process in manufacturing boats. First, the research and development department creates a full-scale prototype of a boat from a drawing of what the boat should look like; second, defendant casts a fiberglass mold of the prototype and makes all the boats from that mold. Dumford testified that in producing the prototype, defendant sprays a slip-resistant sand-and-paint mixture onto the swim platform. The nonskid paint on the prototype then creates a texture in the fiberglass poured into the mold for all boats manufactured from that mold. The swim platform and the foredeck of the prototype are the only surfaces that are painted with the nonskid paint mixture.

U.S. Paint manufactured the nonskid sand-and-paint mixture that defendant used in manufacturing the boat in question. Christian Von Der Hyde, president and chief executive officer of U.S. Paint, testified

that the sand-and-paint mixture can be applied in two ways: (1) by mixing the sand into the paint and spraying it on the boat or (2) by adding the sand to tacky paint already on the boat. Von Der Hyde also stated that for the first method, spray application, U.S. Paint recommends its customers mix four ounces of sand with every gallon of paint.

Dumford testified that he is not aware of any standard for mixing the sand and the paint. The employee who paints the boat creates a mixture of sand and paint, places the mixture onto a sheet of paper, and shows it to the plant manager for approval. Dumford stated that as the plant manager, he examines and approves the sand-and-paint mixture by feeling the texture of the test paper and by looking at how many grains of sand are in a square-inch area. Once Dumford approves it, the mixture is deemed adequate for the swim platform of the prototype. Dumford further stated that after the prototype is completed, he and other employees would walk around on the prototype barefoot to test the adequacy of the slip resistance of the swim platform and foredeck. Dumford admitted, however, that (1) he tests the prototype's slip resistance under a dry condition, (2) defendant does not conduct any coefficient-of-friction test of the prototype surface, and (3) defendant does not add additional nonskid surfacing after a boat is removed from the mold.

Dumford testified that defendant began manufacturing a walk-through transom after 1989 to make ingress and egress from the back of the boat easier. A passenger, however, would have to step on the transom to reach the swim platform on the boat in question. Dumford also stated that defendant does not add any nonskid materials to the transom area of the prototype or the mold.

Slocum and Dumford stated that at the end of the manufacturing process, defendant's employees inspect every boat per an inspection checklist. Defendant also tests its large boats by placing them in a water tank in one of the factories. For a boat that is between 18 and 23 feet, which is the size of the boat in question, defendant only sprays water on the boat to check for leaks. On occasion, defendant's employees take a random boat out in the nearby lakes and test the boat by using it themselves. Slocum stated in his deposition that when the boat is taken out in the water, the employees walk around the boat, including the entire front, back, and upholstery barefoot. In addition, they climb across the seats in the upholstered area and step onto the swim platform, where they jump off the boat into the water. Dumford stated in his deposition that testing in the lake involves checking the "engine, electrical, and mechanical, that's it." Dumford further stated that decedent's boat would never have been tested in

the lake because it came off the production line in November, and the lake was frozen.

## 4. *The Instruction Manual*

Defendant provides owners' instruction manuals with its boats. Plaintiff testified decedent received an instruction manual with the boat he purchased. The instruction manual for decedent's boat contains three different types of warnings: (1) a "DANGER" indication, which means severe personal injury or death will result; (2) a "WARNING" indication, which means severe personal injury or death could result; and (3) a "CAUTION" indication, which means minor personal injury or product or property damage could result. The manual provides in two areas the possibilities of slipping and states as follows:

> "CAUTION: Wet surfaces can be slippery. Passengers should wear adequate deck shoes while boarding and underway to avoid accidental slipping and injury."
>
> "CAUTION: Deck areas and swim platform are slippery when wet. Passengers must be careful when passing through companionway to prevent accidental slipping or tripping. Passengers should wear adequate deck shoes at all times to prevent accidental slipping. Passengers must stay off swim platform while underway to prevent falling overboard."

The above provisions are contained in the "Getting Underway" section. The boat itself has no warning labels regarding the danger of slipping or falling from the boat.

## 5. *Plaintiff's Experts' Deposition Testimonies*

James Allen, a retired member of the Coast Guard and a marine consultant, testified with regard to decedent's fall and the slipperiness of the boat surfaces. Allen examined the transom, the swim platform, and the steering areas of the boat in question. Allen then sprayed some water on the platform and walked on it barefoot. Allen stated that he believes the mechanics of decedent's fall are most consistent with a slip on the transom. Allen also stated that based on his barefoot walking on the boat, he concluded the nonskid surface on the swim platform of the boat in question is inadequate. Allen stated that the American Boat & Yacht Council (ABYC) recommends that all walkways and companionways have nonskid surfacing and most manufacturers follow these guidelines. Allen indicated that the transom on the boat is the only way for a passenger to reach the swim platform of the boat and is a walkway. Therefore, defendant failed to meet the ABYC's guidelines by not having any skid-resistant materials on the transom. Allen did acknowledge, however, that ABYC's guidelines are recom-

mendations to the boat manufacturers and are not mandatory. Allen also stated that, based on his experience with the Coast Guard, he believes defendant failed to provide adequate warnings on the possibilities of passengers slipping and falling because no warnings are on the boat and the warnings contained in the instruction manual are insufficient.

Thomas Richardson, an engineering consultant, also testified by way of deposition. Richardson stated that he conducted coefficient-of-friction testing of the transom and swim-platform surfaces of the boat in question. Richardson stated that he also conducted a similar test on a teak surface, a material that is widely used on boats as a nonskid surface. Richardson then compared the results of the two tests and concluded that, based on the measured coefficient of friction, the surface of the boat transom is too slippery and not suitable for walking on when wet.

## B. The Trial Court's Ruling on the Motion for Summary Judgment

On December 31, 2002, the trial court conducted a hearing on defendant's motion for summary judgment. Plaintiff and defendant presented no evidence at the hearing. On February 20, 2003, the court granted defendant's motion for summary judgment. In reaching its decision, the court reasoned as follows:

(1) A triable issue does not exist that the boat was defective or unreasonably dangerous because plaintiff has not sufficiently demonstrated the existence of a design defect that made the boat unreasonably dangerous;

(2) under the facts and circumstances of this case, defendant owed no duty to warn, and, even if there is a legal duty to warn, the warning provided by the instruction manual is adequate as a matter of law; and

(3) plaintiff failed to present any evidence to support any breaches of duty by defendant and failed to prove defendant's breaches, if any, proximately caused decedent's death.

On March 19, 2003, plaintiff filed a motion to reconsider. On May 27, 2003, the trial court heard and denied plaintiff's motion. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

We review a trial court's grant of summary judgment *de novo*. *Sollami v. Eaton*, 201 Ill. 2d 1, 6-7, 772 N.E.2d 215, 218 (2002). Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2002); *Sollami*, 201 Ill. 2d at 6, 772 N.E.2d at 218. Because summary judgment is a drastic means of disposing of litigation, it should be allowed only when "the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992). In addition, a court must consider all evidence presented, including expert depositions, in favor of the nonmoving party and strictly against the movant. *Outboard Marine Corp.*, 154 Ill. 2d at 131-32, 607 N.E.2d at 1223. At the summary judgment stage, a plaintiff is not required to establish his case as he would at trial but must present some factual basis that would arguably entitle him to a judgment. *West v. Deere & Co.*, 145 Ill. 2d 177, 182, 582 N.E.2d 685, 687 (1991).

## B. Plaintiff's Strict-Liability Claim

■ Illinois has adopted the strict-liability formula set forth in section 402A of the Restatement (Second) of Torts (Restatement (Second) of Torts § 402A (1965)) (hereinafter Restatement). *Lamkin v. Towner*, 138 Ill. 2d 510, 528, 563 N.E.2d 449, 457 (1990). Accordingly, Illinois imposes strict liability on anyone who sells any product in a defective condition unreasonably dangerous to consumers, users, or their property. Restatement § 402A; *Lamkin*, 138 Ill. 2d at 528, 563 N.E.2d at 457. A product may be considered unreasonably dangerous for two reasons: (1) because of a design or manufacturing defect (design-defect theory) or (2) because of a failure to warn consumers of a danger posed by the product of which the average consumer would not already be aware (failure-to-warn theory). *Lamkin*, 138 Ill. 2d at 528, 563 N.E.2d at 457.

### 1. *The Design-Defect Theory*

Plaintiff first alleges that the trial court erred in concluding that she failed to sufficiently demonstrate the existence of a design defect that made the boat unreasonably dangerous. Plaintiff argues that the trial court failed to apply both of the required tests used to determine whether a design defect exists, and therefore the court erred in granting summary judgment to defendant on the strict-liability count. We agree.

■ In Illinois, a plaintiff may demonstrate that a product is defective in design, so as to subject a retailer and a manufacturer to strict liability for resulting injuries, in one of two ways: (1) by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or (2) by introducing evidence that (a) the

product's design proximately caused his injury and (b) the defendant failed to prove that on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design. *Lamkin*, 138 Ill. 2d at 528, 563 N.E.2d at 457. Therefore, since 1990, two alternative tests exist in Illinois to determine a manufacturer's strict liability under a "design-defect" theory: a "consumer-user contemplation" test and a "danger-utility" test. *Scoby v. Vulcan-Hart Corp.*, 211 Ill. App. 3d 106, 109, 569 N.E.2d 1147, 1149 (1991).

Usually, a court should apply both tests to determine whether a design defect exists. *Scoby*, 211 Ill. App. 3d at 111, 569 N.E.2d at 1151. However, an action is barred under the consumer-user contemplation test if the danger was open and obvious to the plaintiff. *Hunt v. Blasius*, 74 Ill. 2d 203, 211, 384 N.E.2d 368, 372 (1978). Under the danger-utility test, the open and obvious nature of the danger is a factor to be considered when determining whether a design defect exists, but an open and obvious danger does not *per se* bar recovery under this test. *Wortel v. Somerset Industries, Inc.*, 331 Ill. App. 3d 895, 902, 770 N.E.2d 1211, 1216 (2002).

### a. The Danger-Utility Test

Plaintiff argues that defendant failed to address or present evidence to overcome its burden under the danger-utility test, and, therefore, the trial court erred in granting summary judgment. The record before the court at the time of its ruling on defendant's motion for summary judgment contained none of the evidence required to obtain summary judgment under the danger-utility test, *i.e.*, evidence that the benefits of the challenged design outweigh the risk of danger inherent in the design. However, defendant maintains the court correctly refused to apply the danger-utility test because the danger of the alleged design defect was open and obvious and the mechanism involved was simple; therefore, the test was inapplicable.

### i. *A Genuine Issue of Material Fact Exists Regarding the Applicability of the Danger-Utility Test*

Defendant argues the danger-utility test is inapplicable in the instant case because the alleged danger was open and obvious and the mechanism was simple. Defendant cites this court's decision in *Scoby*, 211 Ill. App. 3d 106, 569 N.E.2d 1147, in support of its argument.

In *Scoby*, this court concluded that the danger-utility test would not apply when the nature of the danger is obvious and the nature of the mechanism involved is simple. *Scoby*, 211 Ill. App. 3d at 112, 569 N.E.2d at 1151; see also *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 764 N.E.2d 35 (2002) (the supreme court, in deciding that a danger-utility test should be applied to determine a friction-fit connec-

tor manufacturer's strict liability, stated that the *Scoby* exception is "inapposite" because the danger of disconnection is not "open and obvious" and the mechanism of a friction-fit connector is not simple); *Wortel*, 331 Ill. App. 3d at 909, 770 N.E.2d at 1222.

Based on the principle of *stare decisis*, which, as the Supreme Court of Illinois stated in *Wakulich v. Mraz*, 203 Ill. 2d 223, 230, 785 N.E.2d 843, 848 (2003), quoting *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 47, 697 N.E.2d 699, 708 (1998), requires a court to " 'stand by precedents and not to disturb settled points,' " we follow the *Scoby* exception to the universal application of the danger-utility test and continue to hold that the danger-utility test does not apply given an open-and-obvious danger and where the product involved is simple.

In the instant case, as the movant, defendant had the burden to establish that its right to summary judgment was "free and clear from doubt." Therefore, this court must first determine whether a genuine issue of material fact existed regarding the simplicity of the product involved and the open-and-obvious nature of the danger. See *Outboard Marine Corp.*, 154 Ill. 2d at 102, 607 N.E.2d at 1209.

### (a) *The Trial Court Erred in Granting Summary Judgment Because a Genuine Issue of Material Fact Exists Regarding Whether the Mechanism Was Simple*

■ As stated above, the simplicity of an allegedly defective product is one element of an exception under which the "risk-utility" test would not apply. Even though courts (both Illinois courts and federal courts applying Illinois law) have determined the applicability of the "risk-utility" test based on the *Scoby* exception, few specific guidelines state how to determine whether a product/mechanism is simple. See *Scaccianoce v. Hixon Manufacturing & Supply Co.*, 57 F.3d 582, 586-87 (7th Cir. 1995) ("We have little guidance either from our own opinion or from the Illinois courts as to the criteria for distinguishing 'simple' products from the not so simple"). Cases applying the *Scoby* exception indicate that the simplicity of the product is a question of law (see, *e.g.*, *Scaccianoce*, 57 F.3d at 586 (stating "this [simple-product] characterization is a matter of law to be determined by the court")), and courts make decisions based on their evaluations of the products before them. Since there is no developed test, we must examine courts' previous holdings and the rationale underlying the "risk-utility" test and the *Scoby* exception to correctly determine if the product-mechanism in the instant case is "simple."

First, let us compare the allegedly defective product in question, a motorboat, to the other products where courts have made the "simplicity" determination (see *McDaniel v. Trail King Industries, Inc.*, 248 F.

Supp. 2d 749, 756 (N.D. Ill. 2002) (stating the best way to determine whether a product is simple is by *analogy*)). As discussed above, this court in *Scoby* found an open-lid deep fryer to be a "simple" product (see *Scoby*, 211 Ill. App. 3d at 112, 569 N.E.2d at 1151 (stating "the mechanics involved [in a deep fryer] are simple")). Compared to a deep fryer, a motorboat clearly has more complex mechanisms. In fact, a motorboat is also a lot more complex than the two products that the Illinois Supreme Court deemed not to be "simple" and to which it applied the danger-utility test: the window screen in *Lamkin*, 138 Ill. 2d 510, 563 N.E.2d 449, and the "friction-fit" connector used to connect the IV tube to a catheter in *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 764 N.E.2d 35 (2002). As plaintiff's counsel correctly pointed out by reply brief, other products that courts have found not to be "simple" include a hydraulic lifting system (*Fuller v. Rand Automated Compaction Systems, Inc.*, No. 92—C—1797 (N.D. Ill. March 7, 1995)), a corn picker combine (*Besse v. Deere & Co.*, 237 Ill. App. 3d 497, 502, 604 N.E.2d 998, 1002 (1992)), a trailer with a tarping system (*McDaniel*, 248 F. Supp. 2d at 756), a pizza-dough rolling machine (*Wortel*, 331 Ill. App. 3d 895, 770 N.E.2d 1211), and a manually operated lathe (*Staecker v. Hitachi Seiki U.S.A., Inc.*, No. 95—C—0743 (N.D. Ill. January 21, 1998)). On the other hand, products courts found to be "simple" include a disposable lighter (*Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994)), a tampon (*Haddix v. Playtex Family Products Corp.*, 138 F.3d 681, 685 (7th Cir. 1998)), and a pair of panty hose (*Golden v. Marshall Field & Co.*, 134 Ill. App. 3d 100, 479 N.E.2d 1211 (1985)). The mechanism involved in a motorboat is much closer in terms of complexity to a prism pole, corn picker combine, trailer, pizza-dough rolling machine, or hydraulic lifting system than a deep fryer, disposable lighter, tampon, or panty hose. A motorboat, therefore, is not a simple product.

Further, in *Scaccianoce*, 57 F.3d at 586-87, the Seventh Circuit Court of Appeals found a surveyor's prism pole to be not "simple," stating the fact that some degree of expertise is required to use the prism pole takes it out of the class of "simple" products. Similar to a prism pole, a motorboat is an instrument that requires some training and expertise to use. The boat in question came with a manual that instructed boaters on everything from "steering" to "docking." The manual also "urges" boaters to "attend the instruction classes and boat[-]safety courses sponsored by the U.S. Coast Guard and other organizations." Like the prism pole in *Scaccianoce*, the boat in question is also not a simple product.

The determination that the motorboat in question is not a simple product is not only consistent with the previous case law but also

coincides with the economic rationale underlying the "risk-utility" test and the *Scoby* exception.

As the Supreme Court of Illinois stated in *Lamkin*, 138 Ill. 2d at 528, 563 N.E.2d at 457, the "risk-utility" test compares the risk and benefit of an allegedly defective design. A court imposes strict liability on a manufacturer when the danger outweighs the benefit and there is an alternative, cost-effective design that would make the product safer. As such, it is an economic-based tort approach. See 2 D. Dobbs, Torts § 357, at 985-87 (2001). The *Scoby* exception, on the other hand, provides an economical threshold under which the cost-benefit analysis is unnecessary. In other words, when a product is simple, the overall cost of manufacturing the product is low, and the cost of an alternative, safer design or a mandatory safety device would be disproportionately high. Despite the "less-safe" design, consumers are protected because they can appreciate the obviously dangerous propensity of the product. Since very few consumers are likely to be injured by a "simple but obviously dangerous" product, it is economically efficient to place the risks on the consumers rather than on the manufacturer. The *Scoby* exception, therefore, essentially states the following: in very extreme cases (*i.e.*, products with very low production costs), courts may make the determination that the cost-benefit analysis under the "risk-utility" test strongly favors the manufacturer and there is no need to send the case to jury because no reasonable jury could find for the plaintiff. Consequently, summary judgment for manufacturers would be appropriate in those cases.

In the instant case, the motorboat retails for over $20,000. Plaintiff's expert witnesses alleged that the boat in question is defective because it does not provide adequate antiskid protection to the passengers on board. According to plaintiff's experts, the boat manufacturer could easily have cured the alleged defect by adding antislip stripes to the transom surface or by applying nonskid paint to the mold. Since this is review of an award of summary judgment, we must consider all evidence presented, including expert depositions, in favor of the nonmoving party and strictly against the movant. Accepting plaintiff's experts' testimonies as true, the cost of a safer design in this case is minimal when compared to the overall cost of the boat. As discussed above, the economic rationale underlying the *Scoby* exception is to dispose of those cases where the risk-benefit analysis strongly favors the manufacturer. The economics of this case clearly do not warrant such a disposition.

Moreover, defendant presented no evidence or legal authority to establish the simplicity of a motorboat. Instead, defense counsel wants us to focus only on the transom and swim-platform surfaces of the

boat, the particular areas where the injury might have occurred. We disagree with this suggested approach for three reasons. First, defendant cited no legal authority to support its contention that a court should determine the simplicity of a product based on only the particular part of the product where the injury occurred. Defendant did not fulfill its duty of presenting a reviewing court with clearly defined issues and relevant authorities. See 210 Ill. 2d R. 341(e)(7). As a result, any point raised but not argued or supported by citation to relevant authority is deemed forfeited (*Brown v. Tenney*, 125 Ill. 2d 348, 362, 532 N.E.2d 230, 236 (1988)).

Further, our own research evidences that, in making the simplicity determination, courts have always focused on the entire product, rather than a particular area of the product. See *e.g.*, *Besse*, 237 Ill. App. 3d at 502, 604 N.E.2d at 1002 (where the plaintiff's injury was a result of her right leg touching the combine's running chain, and the court held a "combine-with-attached-cornhead mechanism involved in this case is not so simple in nature as to preclude application of the risk/benefit analysis test"); see also *Wortel*, 331 Ill. App. 3d at 909, 770 N.E.2d at 1222 (where the plaintiff's hand got caught in the rollers of a pizza-dough rolling machine, and the court found "the pizza[-]dough rolling machine here *** is a complex machine").

Second, as discussed above, the economic rationale underlying the *Scoby* exception requires us to look at the production cost of the entire product so that we can determine whether it is economically sensible to require a manufacturer to adopt a safer design. To focus only on a particular area of a product would defeat the purpose of the "risk-utility" test as manufacturers can always pinpoint a particular area of a complex product and argue that the mechanism of that area is simple and the production cost is low. For example, the defendants in *Besse* and *Wortel* could argue that the "products" in their respective cases are the running chain and the rollers instead of the "combine-with-attached-cornhead mechanism" and the "pizza[-]dough rolling machine."

Third, even accepting the notion that the product in question is the surface of the boat, defendant failed to establish that this particular boat surface is a "simple" product for the purpose of granting summary judgment. A regular floor surface may be a "simple" product, but the surface of a boat, which needs to function safely on water and provide slip-resistance to the passengers on board and is made from fiberglass, then poured into a mold, and then processed into a boat surface, is not necessarily a "simple" product. Defendant presented no evidence to support its assertion that the boat surface is

a "simple" product and therefore did not meet the evidentiary burden for an award of summary judgment.

(b) *The Trial Court Erred in Granting Summary Judgment Because a Genuine Issue of Material Fact Exists Regarding Whether the Danger is Open and Obvious*

■ Even assuming the product in question is the boat surface alone and further assuming the boat surface is a "simple" product, under the *Scoby* exception, a trial court is still required to apply the "risk-utility" test to determine a manufacturer's strict liability if the allegedly defective product is not "obviously dangerous." An open and obvious danger exists only where "both the condition and the risk are apparent to and would be appreciated by a reasonable person in the plaintiff's position exercising ordinary perception, intelligence, and judgment." *Simmons v. American Drug Stores, Inc.*, 329 Ill. App. 3d 38, 43, 768 N.E.2d 46, 52 (2002), citing *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 435, 566 N.E.2d 239, 241 (1990).

Defendant asserts, and the dissent agrees, the danger in this case is that the boat surface becomes slippery when wet. As such, defendant maintains ordinary consumers are aware of such "obvious" dangers. We disagree with such a characterization. An ordinary consumer certainly would expect boat surfaces to become slippery when wet. The same consumer, however, would not necessarily know that certain surface areas of the boat, on which the manufacturer intended passengers to walk under wet conditions, are so slippery that they should not walk on those areas when the boat is wet.

In this case, plaintiff alleges that defendant did not provide adequate antiskid texture on the swim platform because defendant failed to follow the nonskid-paint instructions, and defendant applied nonskid materials only on the prototype. Here, the danger faced by a boat user is not merely that the swim platform is "slippery when wet" but the lack of sufficient protection provided by the resulting nonskid surface. In other words, a boat user would expect a certain level of protection from a texturized swim platform, and a danger arises when the actual level of protection provided fell below that expectation. Defendant provided no evidence to show that the swim-platform surface on the boat in question provided the level of protection that an ordinary boat user would expect. As movant on the summary-judgment motion, defendant had the burden to establish that its right to summary judgment was "clear and free from doubt." Accordingly, defendant failed to establish the alleged danger of the swim platform is "open and obvious" to an ordinary consumer as a matter of law.

Plaintiff also alleges the following design defects in the transom: (1) on the boat in question, to reach the swim-platform area, a passenger would have to step onto and walk on the transom; (2) defendant did not apply any nonskid materials on the transom surface despite the recommendations by the ABYC; (3) defendant did not conduct any tests regarding the slipperiness of the transom surface; and (4) the resulting transom surface has a very low coefficient of friction and is deemed by plaintiff's experts as too slippery for walking on under wet conditions. These allegations raise a genuine issue of material fact: whether the danger posed by the transom surface was open and obvious. Stated differently, a boat user might know that a boat surface is slippery when wet, but would he know that the transom surface on this particular boat, an area that is essentially a designated walkway, is so slippery that it is not suitable for walking on when wet?

The dissent analogizes the instant case with this court's recent decision in *Bates v. Richland Sales Corp.*, 346 Ill. App. 3d 223, 803 N.E.2d 977 (2004), to reach the conclusion that the danger of the boat surface is also "open and obvious." *Bates* is clearly distinguishable from the instant case. In *Bates*, 346 Ill. App. 3d at 227, 803 N.E.2d at 982, the plaintiff's coworkers removed the manufacturer-installed protective roll bar of a Wrangler loader (to which a sales manager of the manufacturer testified: "it was 'totally inconceivable' that anyone would remove the roll bar; it offended common sense, like removing a seatbelt"), and the plaintiff then backed up the loader against one of the rods in a building, crushing himself to death. This court observed "[a]n ordinary consumer would have fully expected that if this powerful machine, without a roll bar, pushed his or her body against an unyielding object, injury could result." *Bates*, 346 Ill. App. 3d at 235, 803 N.E.2d at 987. In the instant case, decedent walked on and slipped from the surface areas of the boat where the manufacturer intended for a boat user to walk under wet conditions. Unlike the loader manufacturer in *Bates*, which installed the safety device that would have prevented the incident, defendant in the instant case did not install adequate (or in the case of the transom surface, any) antiskid materials. Further, in order to use the boat for tubing or skiing (two uses that defendant intended), decedent had to walk on the transom surface and the swim-platform area so that he could tie a rope to the end of the boat. As plaintiff's experts testified, defendant's later designs employed a walk-through transom design that eliminated this problem. Therefore, unlike *Bates*, where the injury was the result of the decedent's own wrongdoing, in the instant case, the alleged defective design proximately caused plaintiff's husband's death. Accordingly, the dissent's determination that "our reasoning in *Bates* fully

applies to this case, only more strongly" (352 Ill. App. 3d at 676) is inaccurate. A comparison between this case and the *Bates* case would only be appropriate if the loader manufacturer in *Bates* also failed to design and/or install the protective roll bar.

To conclude, contrary to defendant's assertion, plaintiff did not merely allege a "slippery-when-wet" condition. Rather, plaintiff presented expert testimonial evidence that demonstrated specific defects of the boat surfaces that made the boat surface unexpectedly dangerous. Defendant presented no evidence of its own to the contrary (except using certain out-of-context excerpts from one of plaintiff's expert witness's testimony) and therefore failed to establish that the danger possessed by the boat surface is "open and obvious" as a matter of law.

In reaching this conclusion, we also distinguish the Illinois Supreme Court's decision in *Fanning v. LeMay*, 38 Ill. 2d 209, 230 N.E.2d 182 (1967), relied on by defendant, in which a consumer, wearing a pair of shoes made by U.S. Rubber Company, slipped and fell on a wet asphalt-tile floor. The supreme court disallowed the plaintiff's claim against U.S. Rubber Company because "[i]t is a matter of common knowledge that shoes are more likely to slip when wet than when dry, but this provides no basis for the conclusion that a particular pair of shoes is dangerous or unsafe." *Fanning*, 38 Ill. 2d at 211, 230 N.E.2d at 184. Here, the trial court, in granting summary judgment to defendant, stated that "the parallel between the instant case and *Fanning* [citation] is noteworthy." We disagree.

As the supreme court pointed out, the plaintiff in *Fanning* alleged neither any facts setting forth specific design defects nor a reason why the particular pair of shoes in question was dangerous or unsafe. *Fanning*, 38 Ill. 2d at 211, 230 N.E.2d at 184. Plaintiff in the instant case, however, alleges several design defects, including the incorrect application of the nonskid paint on the swim platform, the failure to apply any slip-resistant materials on the transom, and the inadequate testing of the platform and transom, that made the boat in question particularly unsafe or dangerous. In addition, as discussed above, plaintiff does not allege a common-knowledge "slippery-when-wet" danger; rather, the danger in this case results from the discrepancy between a consumer's expectation of adequate antiskid protection and the alleged insufficient protection provided by the manufacturer. Therefore, the supreme court's rationale in *Fanning* is inapplicable to the instant case.

Because a genuine issue of material fact exists regarding whether the danger created by the alleged defect was open and obvious, the trial court erred in not applying the danger-utility test. We now turn

to the question of whether a genuine issue of material fact exists under such a test.

### ii. *A Genuine Issue of Material Fact Exists Under the Danger-Utility Test*

■ To prove a manufacturer's design defect under the danger-utility test, a plaintiff must introduce evidence that the product's design proximately caused his injury and defendant failed to prove that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design. *Lamkin*, 138 Ill. 2d at 529, 563 N.E.2d at 457. Defendant maintains that the trial court correctly concluded that no genuine issue of material fact exists as to defendant's design defects because plaintiff failed to present any evidence to establish that the alleged design defects proximately caused decedent's fall. Plaintiff asserts that a genuine issue exists under the danger-utility test because (1) she presented sufficient evidence to establish that defendant's defective design proximately caused decedent's fall and (2) defendant failed to present any design benefits associated with the alleged design defect. We agree with plaintiff that a genuine issue of material fact exists.

■ First, plaintiff introduced evidence that defendant's alleged design defects were the proximate cause of decedent's fall. Plaintiff's experts testified in their depositions that in designing the swim platform, defendant incorrectly applied the sand-and-paint mixture, limited the nonskid-paint mixture application to the prototype only, and conducted inadequate testing regarding the slipperiness of the swim-platform surface. Plaintiff's experts concluded that as a result of defendant's design deficiencies, the nonskid texture on the swim platform provided inadequate skid protection. Plaintiff's experts also testified that in designing the transom, defendant did not adopt a walk-through feature and did not add any nonskid material on the transom's fiberglass surface. As a result of such design defects, the transom surface has a very low coefficient of friction and is unsuitable for walking on when wet. Plaintiff's experts, therefore, concluded that regardless of whether decedent slipped and fell on the swim platform or the transom, the boat surfaces' inadequate skid protection was the cause of decedent's fatal injury. Plaintiff's experts also stated that in their opinion increased skid protection on the boat surface would have prevented decedent's fall.

Defendant did not present evidence that the alleged design defects were not the proximate cause of decedent's slip and fall or that a different design would not have prevented decedent's fatal injury. Instead, defendant focused its argument on the credibility of plaintiff's

experts, stating plaintiff's experts were not qualified and their opinions were baseless. However, the credibility of the witnesses is to be determined by the jury. *Diversey Liquidating Corp. v. Neunkirchen*, 370 Ill. 523, 528, 19 N.E.2d 363, 365 (1939). Further, in reviewing grants of summary judgment, a court must consider all evidence presented, including expert depositions, in favor of the nonmoving party and strictly against the movant. *Outboard Marine Corp.*, 154 Ill. 2d at 131-32, 607 N.E.2d at 1223. The record as it existed before the trial court at the time of its ruling included plaintiff's evidence from expert testimony that defendant's design defects proximately caused decedent's fall. Defendant failed to rebut this evidence.

Moreover, defendant did not present any evidence to show that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such designs. *Lamkin*, 138 Ill. 2d at 529, 563 N.E.2d at 457. In fact, defendant introduced no evidence of any benefits of the alleged defective design of the swim-platform and transom surfaces. Accordingly, we conclude that defendant was not entitled to summary judgment under the danger-utility test, and the trial court erred in finding for defendant as a matter of law.

### b. The Consumer-User Contemplation Test

■ Plaintiff next argues that the trial court's conclusion that no design defects existed is erroneous because a genuine issue of material fact remains under the consumer-user contemplation test as to whether a design defect exists.

Under the consumer-user contemplation test, a plaintiff may demonstrate a product's defective design by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. *Lamkin*, 138 Ill. 2d at 528, 563 N.E.2d at 457. In *Hunt*, 74 Ill. 2d at 211, 384 N.E.2d at 372, the court stated that the plaintiff's recovery may be barred when the injury merely derives from those inherent properties of a product that are obvious to all who come in contact with the product.

In the case at bar, plaintiff presented evidence that decedent slipped and fell from the back of the boat as he was trying to tie a rope so that he could go tubing. Defendant, by its own statements, intended its boats to be used for tubing or water skiing, activities that require access to the back part of the boat. Therefore, decedent was injured while using the boat in an intended and reasonably foreseeable manner. Plaintiff also alleges that the swim platform and the transom areas of the boat in question provided inadequate skid protection. Plaintiff introduced expert testimony to demonstrate that defendant

failed to meet industrial guidelines for skid resistance and the resulting surfaces are too slippery to be safe.

Defendant asserts that plaintiff is not entitled to recovery under the consumer-user contemplation test because decedent's fatal injury derived from the boat's inherent "slippery-when-wet" property that is obvious to all who come in contact with the product. Defendant, therefore, contends that, based on the Supreme Court of Illinois's holding in *Hunt*, 74 Ill. 2d at 211, 384 N.E.2d at 372, plaintiff presented no genuine issue of material fact under the consumer-user contemplation test. We disagree.

As discussed in the section regarding the applicability of the danger-utility test, plaintiff in the instant case does not merely allege a "slippery-when-wet" danger. Instead, plaintiff alleges that the boat in question was unreasonably dangerous because the actual level of protection provided by the boat surfaces falls below what an ordinary consumer would expect. Such a danger is not one of the "inherent propensities" of the boat; rather, it is alleged to be a feature that was brought about by the particular design of this boat. Accordingly, genuine issues of material fact remain as to whether the defect was open and obvious and whether a design defect exists under the consumer-user contemplation test.

In summary, the trial court erred when it granted summary judgment to defendant because material issues of genuine fact exist under the danger-utility test regarding (1) whether the alleged danger was open and obvious, (2) whether a design defect existed, and (3) whether the benefits of the alleged defective design outweigh the risks. Further, genuine issues of material fact exist under the consumer-user contemplation test regarding (1) whether the alleged danger was open and obvious and (2) whether a design defect exists.

### 2. *The Failure-To-Warn Theory*

■ In addition to design defects, a manufacturer can also be held strictly liable for its failure to warn. *Lamkin*, 138 Ill. 2d at 528, 563 N.E.2d at 457. Plaintiff argues that, in granting the summary judgment to defendant, the trial court also erred in finding (1) defendant had no duty to warn and (2) even if there is a legal duty to warn, the warning provided by the instruction manual was adequate as a matter of law. We first decide the question of whether defendant had a duty to warn.

### a. Whether Defendant Had a Duty To Warn

"A product may be found unreasonably dangerous by *** a failure of the manufacturer to warn of the danger or instruct on the proper use of the product as to which the average consumer would not be

aware." *Sollami*, 201 Ill. 2d at 7, 772 N.E.2d at 219. Specifically, a duty to warn arises "where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm may occur absent a warning." *Sollami*, 201 Ill. 2d at 7, 772 N.E.2d at 219. No duty to warn exists, however, "where the danger is apparent or open and obvious." *Sollami*, 201 Ill. 2d at 7, 772 N.E.2d at 219. The duty to warn is determined by an objective analysis, and the determination of whether a duty to warn existed is a question of law. *Sollami*, 201 Ill. 2d at 7, 772 N.E.2d at 219.

Plaintiff contends that defendant provided some warnings on the slipperiness of the boat surface in its instruction manual and that such warnings, although inadequate, showed that the manufacturer was aware of the danger of the boat's slippery surfaces. Plaintiff therefore claims that defendant was aware that harm may occur due to the slipperiness of the boat surfaces and that knowledge established defendant's duty to warn. Defendant asserts that it had no duty to warn because a "slippery-boat-surfaces" danger is open and obvious. We agree with plaintiff that material issues of fact remain to be resolved as to whether defendant had a duty to warn.

"It is settled law that a manufacturer has no duty to warn of 'those inherent propensities of a product which are obvious to all who come in contact with the product.' " *Sollami*, 201 Ill. 2d at 10, 772 N.E.2d at 221, quoting *McColgan v. Environmental Control Systems, Inc.*, 212 Ill. App. 3d 696, 700, 571 N.E.2d 815, 817 (1991). Here, the danger at issue is the alleged inadequate level of skid protection provided by the boat's transom and the swim-platform surface areas. As discussed above, plaintiff alleged that such a danger is not an "inherent propensity" of the boat but rather a feature that was brought about by defendant's particular design. Defendant did not introduce any evidence regarding an ordinary boat user's knowledge of the specific dangers of the boat in question, and therefore, it did not establish that the danger here is "apparent or open and obvious." Accordingly, we conclude material issues of fact remain as to whether defendant had a duty to warn.

### b. Whether the Warning Provided Was Adequate

■ This court stated in *Byrne v. SCM Corp.*, 182 Ill. App. 3d 523, 547, 538 N.E.2d 796, 811 (1989), that the question of whether a product is unreasonably dangerous because the warnings are inadequate is a question of fact for the jury. Warning is adequate if it is adequate to perform the intended function of risk reduction. *Byrne*, 182 Ill. App. 3d at 547, 538 N.E.2d at 811. Warnings may be found

inadequate if the warnings fail to specify the risk presented by the product, if the warnings are inconsistent with how the product is to be used, if they fail to advise of the reason for the warnings, or if the warnings do not reach the foreseeable users. *Byrne*, 182 Ill. App. 3d at 547, 538 N.E.2d at 811, citing *Collins v. Sunnyside Corp.*, 146 Ill. App. 3d 78, 81, 496 N.E.2d 1155, 1157 (1986).

In this case, plaintiff's expert witnesses testified that defendant provided inadequate warnings. Plaintiff alleged that defendant affixed no warning label on the boat itself to advise boat users of the slippery boat surfaces, and defendant's only communication regarding the danger of slipping and falling appeared in the "getting underway" section under "caution" indicators. Plaintiff's experts concluded that the warning was inadequate because the warning did not specify the seriousness of risks that boat users may encounter and the warning would not reach the intended users.

As this court held in *Byrne*, 182 Ill. App. 3d at 547, 538 N.E.2d at 811, the only purpose of a warning is to apprise the person who would use the product so as to make that person aware of the danger, enabling that person to protect himself. As stated above, in reviewing a summary judgment, all *issues of fact*, pleadings, depositions, and admissions must be construed strictly against the movant and liberally in favor of the party opposing the motion. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 271-72, 586 N.E.2d 1211, 1215 (1992). Therefore, based on the evidence presented, material issues of fact remain as to whether the warning provided by defendant sufficiently alerted potential users of the danger of the boat's swim-platform and transom surfaces. We, therefore, agree with plaintiff that the trial court erred in awarding summary judgment.

## C. Plaintiff's Negligence Claim

Plaintiff next argues that the trial court also erred in granting summary judgment to defendant on the negligence count. Specifically, plaintiff contends that the court erroneously concluded that plaintiff (1) failed to present any evidence to support any breaches of duty by defendant; (2) failed to prove defendant's breaches if any proximately caused decedent's death; and (3) failed to prove that defendant negligently breached its duty to warn. We agree.

### 1. *Breach of Duty To Manufacture a Safe Product*

In Illinois, a manufacturer has a nondelegable duty to produce a product that is reasonably safe for all intended uses. *Hansen*, 198 Ill. 2d at 433, 764 N.E.2d at 43. In *Rotzoll v. Overhead Door Corp.*, 289 Ill. App. 3d 410, 419, 681 N.E.2d 156, 162 (1997), citing *Kokoyachuk v. Aeroquip Corp.*, 172 Ill. App. 3d 432, 437-38, 526 N.E.2d 607, 609-10 (1988), this court stated:

"For a plaintiff to prevail under a theory of design negligence, he must show that the quality of a particular product is insufficient and that the duty of care on the part of the manufacturer required it to design something safer for the user. [Citations.] Regardless of whether a plaintiff alleges strict liability for a design defect or design negligence, he has the burden of proving the existence of a defective condition in the product at the time it left the manufacturer's control."

In the instant case, defendant, as a manufacturer of pleasure boats, had a legal duty to make its boat safe for recreational boating. Defendant acknowledges that it intended its boats to be used for tubing or skiing. To go tubing or skiing, however, a user is required to step onto the surface of the transom of the boat in question to access the swim platform. As discussed above, plaintiff introduced evidence to show defendant, in manufacturing the transom surface, deviated from ABYC's guidelines, which require that all boat walkways have skid protection. As a result, the transom's surface may be defective because it has a low coefficient of friction and may not be suitable for walking on when wet. Similarly, plaintiff introduced evidence to show the texturized swim platform on the boat in question was defective because it did not provide adequate nonskid resistance. Plaintiff's experts testified that defendant should have adopted different designs and conducted more rigorous tests to ensure adequate skid resistance on the boat surfaces. Again, defendant did not rebut this evidence. Based on this evidence, a genuine issue of material fact exists as to whether defendant's boat was defective and whether defendant breached its duty to produce a safe product.

As determined in our earlier discussion related to the danger-utility test, plaintiff presented sufficient evidence to raise genuine issues of material fact regarding whether defendant's breach of duty proximately caused decedent's fatal injury. We, therefore, find the trial court erred in granting summary judgment.

## 2. Breach of Duty To Warn

Finally, plaintiff maintains a duty to warn exists, and by providing inadequate warning, defendant was negligent. Defendant asserts that it had no duty to warn because the danger is open and obvious or, alternatively, it provided adequate warning. Based on our previous discussion on the issue of failure to warn under the strict-liability claim, we conclude that plaintiff raised a genuine issue of material fact as to whether defendant breached its duty to warn under the negligence claim.

Last, in response to the dissent's concern that our decision today is "dangerously close to the point where, under Illinois law, manufac-

turers truly are the absolute insurers of the safety of persons using their products, no matter how simple the product may be, and no matter how it is used" (352 Ill. App. 3d at 678), we reemphasize the nature of the case before us, review of an award of summary judgment. In reversing the trial court, all we decided is that triable issues remain as to (1) whether the boat was defective or unreasonably dangerous, (2) whether defendant owed a duty to warn and whether the warning provided by the instruction manual is adequate, and (3) whether any breach of the duty to warn proximately caused decedent's death. Accordingly, the dissent's concern is unfounded.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's grant of summary judgment.

Reversed.

KNECHT, P.J., concurs.

JUSTICE STEIGMANN, dissenting:

Products-liability law in Illinois is difficult and evolving, and I appreciate the majority's scholarly efforts to appropriately review the trial court's grant of summary judgment for defendant. The majority concludes that the trial court erred in doing so, but for the reasons that follow, I respectfully dissent.

In my judgment, this court's recent decision in *Bates*, 346 Ill. App. 3d 223, 803 N.E.2d 977, is both on point and supportive of the trial court's grant of summary judgment. The allegedly defective product at issue in *Bates* was a Wrangler front-end loader from which the decedent's employer had removed a roll bar. While operating the loader, decedent was killed in an accident that the parties agreed would not have occurred had the roll bar not been removed. Decedent's widow and estate (Bates) sued the loader's seller (Richland) under theories of negligence and strict products liability, alleging that the loader was dangerously defective in its design. The trial court dismissed the negligence counts and later granted summary judgment in favor of Richland on the products-liability counts. On appeal, this court affirmed.

In *Bates*, we first addressed a seller's duty to warn about a product, writing as follows:

"On pain of strict liability in tort, a seller must warn a buyer if (1) the product has dangerous propensities, (2) the seller has greater knowledge than the buyer of the risk of harm from those

propensities, and (3) the seller knows, or should know, that unless the seller warns the buyer of that risk, the buyer will suffer harm. *Sollami*, 201 Ill. 2d at 7, 772 N.E.2d at 219; *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 29, 402 N.E.2d 194, 196 (1980). Unequal knowledge of the risk is the *sine qua non* of a duty to warn. *Sollami*, 201 Ill. 2d at 7, 772 N.E.2d at 219. If, from an objective point of view, the danger would be apparent, or 'open and obvious,' to an ordinary person, the seller has no duty to warn of it. *Sollami*, 201 Ill. 2d at 7, 772 N.E.2d at 219." *Bates*, 346 Ill. App. 3d at 232-33, 803 N.E.2d at 985-86.

This court then rejected Bates' argument as to Richland's failure to warn, explaining as follows:

"Objectively, an ordinary person would know that without some sturdy intervening structure between the driver and the horsepower of that engine, the engine will prevail. Richland had no duty to warn consumers that if they drove the loader toward a guy wire hanging at chest level, without any protective structure between them and the guy wire, they could get hurt. Everyone already knew that, and the warning would have been pointless. See *Smith v. American Motors Sales Corp.*, 215 Ill. App. 3d 951, 957, 576 N.E.2d 146, 151 (1991). Essentially, plaintiff asks us to impose on [the dealer] a duty to warn against an obvious danger. We decline to do so. See *Sollami*, 201 Ill. 2d at 7, 772 N.E.2d at 219." *Bates*, 346 Ill. App. 3d at 233, 803 N.E.2d at 986.

In my judgment, our reasoning in *Bates* fully applies to this case, only more strongly. The product at issue in this case—namely, the wet surface of a boat—could *literally* not be more simple. This is especially true when one compares it to a much more complicated mechanism like the front-end loader at issue in *Bates*. Yet, this court in *Bates* held that operating the loader without the roll bar was an obvious danger about which no warning was required; clearly, the same is true about the wet surface of a small boat out on the Mississippi River.

The majority's response to my characterization of the wet surface of the motorboat as "a simple product" is to change the focus of inquiry from the surface of the boat to the boat as a whole. This broader focus would be appropriate if (for instance) plaintiff's lawsuit were based on a claim that (1) the boat's motor malfunctioned due to improper design, or (2) the steering mechanism was faulty. However, when the claim—as here—is nothing more than that a portion of the boat's surface was slippery when wet, these other aspects of the boat—complicated though they may be—are irrelevant. In my view, the alleged complexity of an object need not—and should not—be considered (so as to defeat the idea of a "simple product" for purposes of products liability law) unless some aspect of that complexity is an issue. In this

case, because none of the complex workings of the motorboat are at issue, they should not be considered, and this court's focus should remain on the only instrumentality of the boat that plaintiff alleges had anything to do with decedent's injury: the surface when wet.

In *Bates*, this court also addressed the plaintiff's claim that the front-end loader was unreasonably dangerous because the roll bar was readily removable. In so doing, we first discussed our supreme court's decision in *Lamkin*, 138 Ill. 2d at 529, 563 N.E.2d at 457, and then wrote the following:

> "In *Scoby*, 211 Ill. App. 3d at 109, 569 N.E.2d at 1149, we called the first method, in the passage quoted above, the 'consumer-user contemplation test' and the second method the 'danger-utility test.' We held that if the dangerous propensity of the product was obvious and the 'mechanism involved' was simple, a court should apply the consumer-user contemplation test rather than the danger-utility test. *Scoby*, 211 Ill. App. 3d at 112, 569 N.E.2d at 1151.
>
> The dangerous power of the loader was obvious, and the mechanism of the injury was simple. Therefore, we will apply the consumer-user contemplation test rather than the danger-utility test. See *Scoby*, 211 Ill. App. 3d at 112, 569 N.E.2d at 1151." *Bates*, 346 Ill. App. 3d at 234, 803 N.E.2d at 987.

This court then rejected that portion of the plaintiff's products-liability claim, explaining as follows:

> "In this case, plaintiff falls into essentially the same fallacy as the plaintiffs in *Scoby* and *Smith*: she complains of the lack of a safety device while failing to recognize that the dangerous propensity of the product, without that safety device, was obvious. In *Scoby*, 211 Ill. App. 3d at 108, 569 N.E.2d at 1148-49, the plaintiff argued that a deep-fat fryer, in which he had accidentally submerged his arm, was unreasonably dangerous in that it lacked a cover, which was merely 'optional equipment.' We agreed with the trial court that 'the dangerous nature of the open fryer containing hot oil' was 'obvious to the plaintiff.' *Scoby*, 211 Ill. App. 3d at 109, 569 N.E.2d at 1149.
>
> In *Smith*, 215 Ill. App. 3d at 953, 576 N.E.2d at 148-49, the plaintiff argued that a Jeep with detachable side doors was unreasonably dangerous in that, with the driver's door removed, it allowed ('invited') him to drive with his left leg extended outside the passenger compartment, on an outside step, making the leg vulnerable when a car struck the driver's side. The First District held that driving the Jeep with one's foot outside the passenger compartment posed an 'open and obvious danger,' for which the manufacturer could not incur strict products liability. *Smith*, 215 Ill. App. 3d at 959, 576 N.E.2d at 152. Similarly, in the present

678

case, the danger that the driver's body might collide with low-hanging objects is equally obvious to an ordinary person driving a loader without a roll bar." *Bates*, 346 Ill. App. 3d at 235, 803 N.E.2d at 987-88.

As this court did in *Bates*, we should apply the consumer-user contemplation test instead of the danger-utility test to the product at issue in this case—namely, the wet surface of the boat—because "the dangerous propensity of the product was obvious and the 'mechanism involved' was simple." *Bates*, 346 Ill. App. 3d at 234, 803 N.E.2d at 987.

In conclusion, I strongly disagree with the majority's decision. I believe that it is inconsistent with this court's recent decision in *Bates*, inconsistent with earlier decisions of this court, particularly *Scoby*, and may cause turmoil in products-liability law in Illinois. If the fact that the surface of a boat becomes slippery when wet becomes the basis for a products-liability claim, then we may be dangerously close to the point where, under Illinois law, manufacturers truly are the absolute insurers of the safety of persons using their products, no matter how simple the product may be, and no matter how it is used.