SUSAN CALLES, Independent Adm'r of the Estate of Jillian Calles, Deceased, *et al.*, Plaintiffs-Appellants, v. SCRIPTO-TOKAI CORPORATION *et al.*, Defendants and Counterdefendants-Appellees (Richard Fox *et al.*, Defendants and Counterplantiffs-Appellants).

First District (6th Division)   Nos. 1—04—0218, 1—04—0219 cons.

Opinion filed June 30, 2005.

Corboy & Demetrio (Thomas A. Demetrio and Margaret M. Power, of counsel), and Herbolsheimer, Lannon, Henson, Duncan & Reagan, P.C. (Michael T. Reagan, of counsel), both of Chicago, for appellant Susan Calles.

Dykema, Gossett, Rooks, Pitts, P.L.L.C., of Joliet (Terrence M. Burns, Pamela Davis Gorcowski, and John M. Steed, of counsel), for appellants Richard Fox and Loyola University Medical Center.

Freeborn & Peters, L.L.P., of Chicago (Michael D. Freeborn, Michael P. Kornak and Patrick J. Woytek, of counsel), and Van Etten, Suzumoto & Becket, L.L.P., of Santa Monica, California, for appellees.

JUSTICE McNULTY delivered the opinion of the court:

This case presents a straightforward question concerning the reach of tort law. When the defendant designed a product intended to create a flame, it did not incorporate available inexpensive technology to make the product child-resistant. A child got hold of the product and started a fire that led to her sister's death. Should the court consider the design defective because it lacked child-resistant features? We find the evidence in the record sufficient to pose a factual question of whether the design is defective.

## BACKGROUND

Susan Calles purchased an Aim 'n Flame lighting rod in March 1998. The lighting rod, shaped like a gun, produced a flame at the end

of its barrel when one pulled the trigger. Susan used the rod to light a grill she used for cooking almost every day. On March 31, 1998, Susan put her three-year-old daughters Jillian and Jenna to bed. She left them in the care of their oldest sister Amanda, while Susan took her five-year-old daughter to a store. When they returned about half an hour later, Susan saw fire trucks around her house. She found Amanda and Jenna outside, and then she saw Jillian sitting up in an ambulance. She accompanied her daughters to the hospital. Jillian died in the hospital a few weeks later.

An investigator found the remains of an Aim 'n Flame lighting rod in Jillian and Jenna's bedroom, where the fire started. The investigator concluded from the available evidence, including interviews with the children, that Jenna used the Aim 'n Flame to start the fire.

Jillian's estate sued Tokai Corporation, which designed and sold the Aim 'n Flame lighting rod, and Tokai's subsidiary, Scripto-Tokai Corporation, which distributed the lighting rod. The estate also sued Jillian's doctor, Richard Fox, and Loyola University Medical Center, where Fox treated Jillian. Fox and Loyola filed a cross-claim against Tokai and Scripto-Tokai. The estate, Fox and Loyola sought to recover on theories of strict liability and negligence, with both theories premised on defective design and failure to warn.

Tokai and Scripto-Tokai moved for summary judgment, claiming that Illinois law imposes no duty to make products child-resistant. The rod worked exactly as Susan, the consumer, expected it to work, and therefore she could not show a design defect. Also, Tokai and Scripto-Tokai argued that they had no duty to warn Susan of the dangers because Susan already knew of the open and obvious dangers of the Aim 'n Flame.

In her deposition Susan testified that she knew lighters could be dangerous in the hands of children. She instructed all of her children about the dangers of fire and lighters like the lighting rod. She stored the lighter on the top shelf of her kitchen cabinet so that her children could not reach it. She acknowledged that the children could get onto the counter, and from there they might be able to reach the lighting rod on the top shelf. Susan did not remember whether she had read the warnings that came with the rod, which instructed purchasers to keep the rod away from children. She admitted that the rod worked just as she expected it to work.

Jillian's estate presented affidavits from experts who said that, with technology available long before Susan bought the Aim 'n Flame, Tokai could have designed a child-resistant lighting rod and producing the child-resistant rod would cost only a few cents more than producing the rod without child-resistant features. In the experts' opinions,

the proposed features would almost certainly have prevented Jenna from using the lighting rod to start the fire. One of the experts opined that Tokai did not include sufficient warnings with the rod. The label should have warned that small children may be able to operate the lighter, and it should have borne a more conspicuous danger symbol.

An expert found reports of "at least 200 incidents" involving accidental fires started with Tokai's Aim 'n Flame. Children had used the Aim 'n Flame or a similar lighting rod to start about 250 fires before September 1998. More than three-fourths of the incidents involved fires started by children less than five years old. Cigarette lighters, which mostly use mechanisms similar to the lighting rod, have a long history of peril.

> "From 1980 through 1985, an estimated 750 persons were injured and 120 people died each year in residential fires started by children playing with lighters. [Citation.] Estimated costs of these fires was between 300 and 375 million dollars. [Citation.] In 1988 through 1990, the number of injuries caused annually by children playing with lighters increased to 1,100, and the number of deaths rose to 150. [Citation.] Children three to four years old caused most of the fires. [Citation.] Prior to 1989, a child under the age of five was burned to death every day by a fire started with a disposable lighter. [Citation.]
>
> An estimated 80 to 105 deaths per year would be avoided by the implementation of childproof lighters. [Citation.] Approximately 205-270 million dollars in potential damages would be saved by manufacturing childproof lighters. [Citation.] Estimates of manufacturing costs for initially producing childproof lighters approached 50 million dollars. [Citation.] In 1993, manufacturers were expected to see a one to five percent increase in production costs and a one to five cent increase in per-unit cost." *Robins v. Kroger Co.*, 80 S.W.3d 641, 645-46 (Tex. App. 2002).

Another study found:

> "5,800 residential structural fires, 170 deaths, and 1,190 injuries occur each year because of children under 5 playing with lighters. The annual cost of children playing with lighters has been estimated at $300 million to $375 million." Annotation, *Products Liability: Lighters and Lighter Fluid*, 14 A.L.R.5th 47, 56, § 2(a) (1993).

The trial court held that Tokai and Scripto-Tokai "neither owed nor breached any duty imposed upon them by law," and therefore the court entered summary judgment for Tokai and Scripto-Tokai on all counts against them in the estate's complaint and in the cross-complaint Fox and Loyola filed. Later the court added a finding of no just reason to delay appeal from the summary judgment order.

## ANALYSIS

We review *de novo* the decision to grant Tokai and Scripto-Tokai summary judgment. *North American Insurance Co. v. Kemper National Insurance Co.*, 325 Ill. App. 3d 477, 481-82 (2001).

■ A plaintiff can establish a cause of action for strict products liability based on a defective design in either of two ways. *Lamkin v. Towner*, 138 Ill. 2d 510, 529 (1990). A plaintiff may succeed either:

> "(1) by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or (2) by introducing evidence that the product's design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs." *Lamkin*, 138 Ill. 2d at 529.

The two tests are not mutually exclusive. *Besse v. Deere & Co.*, 237 Ill. App. 3d 497, 501 (1992). In many states courts consider the benefits and risks of a product's design as evidence of what a reasonable consumer should expect. See *Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192, 1196-97 (4th Cir. 1982); *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 220, 694 A.2d 1319, 1333 (1997) (and cases cited therein). Other states that use risk-benefit analysis allow evidence of consumer expectations—especially consumer anticipation of danger—for its relevance to the risks and benefits of the product's design. See *Camacho v. Honda Motor Co.*, 741 P.2d 1240, 1247 (Colo. 1987). In general, courts should apply the tests together. *Besse*, 237 Ill. App. 3d at 501.

One court in Illinois formed an exception to the general rule. In *Scoby v. Vulcan-Hart Corp.*, 211 Ill. App. 3d 106 (1991), the plaintiff, a cook, burned his arm in a vat of hot oil when he slipped in the kitchen of a restaurant. He sued the manufacturer of the vat, arguing that the manufacturer designed the vat defectively by making it without a protective lid. The trial court granted the manufacturer summary judgment, and the Appellate Court for the Fourth District affirmed. The court said:

> "Very hot liquid is, of course, quite dangerous, but the danger was very obvious to both the defendant and the plaintiff. Clearly, at times, efficient kitchen operation would require keeping a top off of the fryer. Defendant draws analogy to a sharp kitchen knife that might be on a table. It asks whether a manufacturer of the knife could be strictly liable if somebody were cut by the knife if the manufacturer did not furnish with the knife, as a usual part and advertised as a safety factor, a sheath to cover the blade of the knife. ***
> We do not deem that *Lamkin* or other cases applying aspects of

the danger-utility test intend that all manufacturers of products described above should be subject to liability depending upon a trier of fact's balancing under that test, when suit is brought by one injured by such a product. Somewhere, a line must be drawn beyond which the danger-utility test cannot be applied. Considering not only the obvious nature of any danger here but, also, the simple nature of the mechanism involved, we conclude the circuit court properly applied only the consumer-user contemplation test." *Scoby*, 211 Ill. App. 3d at 112.

Although no other district has followed *Scoby*, several courts, including our supreme court, have distinguished *Scoby*. In *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420 (2002), the defendant sold an intravenous tubing set that included a friction fit connector. The plaintiff was injured when the connector failed. On appeal from a verdict for the plaintiff, the defendant contended that the court should not have applied risk-benefit analysis to the simple connector, which worked when one shoved together the fittings for the intravenous tube. *Hansen*, 198 Ill. 2d at 423. Our supreme court found "no rational comparison between this device and a kettle of boiling oil." *Hansen*, 198 Ill. 2d at 437. Thus, the court did not apply the *Scoby* exception for simple products.

The United States Court of Appeals for the Seventh Circuit applied *Scoby* broadly, in a case similar to the case now before us. In *Todd v. Societe Bic, S.A.*, 21 F.3d 1402 (7th Cir. 1994), a four-year-old child started a fire in her home while playing with a cigarette lighter. A younger child died in the blaze. The younger child's estate sued the manufacturer of the lighter, claiming that the lack of any child-resistant features made the lighter's design defective. The trial court granted summary judgment in favor of the manufacturer.

The appellate court, over several dissents, affirmed the decision. The majority purported to apply *Scoby*, although the majority did not allude to the discussion in *Scoby* of the effect of the proposed safety device on the efficient use of the simple product. The court decided that *Lamkin*

"says nothing more than Illinois authorizes the risk-utility test in products liability cases. The statement does not address whether this authorization extends to simple but obviously dangerous products. To the extent that one might read the statement as covering simple but obviously dangerous products, the statement is mere dictum. Indeed, *Lamkin* had nothing to do with such products ***.

\* \* \*

*** [T]he Illinois Supreme Court would not apply the risk-utility test to a simple but obviously dangerous product. An ordinary disposable lighter is such a product. Therefore, the district court

was correct to determine that such a lighter is obviously dangerous, but not unreasonably dangerous, without reference to the risk-utility test." *Todd*, 21 F.3d at 1411-12.

In *Lamkin* a two-year-old child suffered severe injuries when he leaned on a screen in a window and the screen gave way. *Lamkin v. Towner*, 190 Ill. App. 3d 631, 633 (1989), *rev'd*, 138 Ill. 2d 510. Our supreme court fully applied risk-benefit analysis, without any exception for the simple operation of the screen. Any adult would recognize the obvious danger of leaning against a screen in an open window. Since, according to the majority in *Todd*, 21 F.3d at 1408-09, courts must evaluate the obviousness of the danger from an adult perspective, the screen appears to qualify as a simple but obviously dangerous product. The majority in *Todd* does not explain its odd conclusion that *Lamkin* did not involve a simple but dangerous product. The refusal to apply risk-benefit analysis to a simple but obviously dangerous product in *Todd* apparently conflicts with our supreme court's application of that test to a simple but obviously dangerous product in *Lamkin*.

The Illinois Appellate Court for the Fourth District recently clarified the decision in *Scoby*, in a manner that better reconciled the decision with *Lamkin*. In *Miller v. Rinker Boat Co.*, 352 Ill. App. 3d 648 (2004), a man drowned after he slipped off a wet deck on a boat the defendant manufactured. The man's estate sued the manufacturer, claiming that the defendant could have designed the boat with a less slippery surface, at little added cost. The trial court granted the defendant summary judgment based solely on the court's assessment of the expectations of reasonable consumers. The appellate court reversed, finding a triable issue of fact concerning the balance of the risk and utility of the boat's design.

The defendant argued that the boat's surface was a simple product and obviously dangerous when wet. The court explained:

"[T]wo alternative tests exist in Illinois to determine a manufacturer's strict liability under a 'design-defect' theory: a 'consumer-user contemplation' test and a 'danger-utility' test. [*Scoby*, 211 Ill. App. 3d at 109.]

Usually, a court should apply both tests to determine whether a design defect exists. *Scoby*, 211 Ill. App. 3d at 111, 569 N.E.2d at 1151.

\* \* \*

\*\*\* The *Scoby* exception \*\*\* provides an economical threshold under which the cost-benefit analysis is unnecessary. In other words, when a product is simple, the overall cost of manufacturing the product is low, and the cost of an alternative, safer design or a

> mandatory safety device would be disproportionately high. Despite the 'less-safe' design, consumers are protected because they can appreciate the obviously dangerous propensity of the product. Since very few consumers are likely to be injured by a 'simple but obviously dangerous' product, it is economically efficient to place the risks on the consumers rather than on the manufacturer. The *Scoby* exception, therefore, essentially states the following: in very extreme cases (*i.e.*, products with very low production costs), courts may make the determination that the cost-benefit analysis under the 'risk-utility' test strongly favors the manufacturer and there is no need to send the case to jury because no reasonable jury could find for the plaintiff." *Miller*, 352 Ill. App. 3d at 661-64.

The court found the boat and its deck not so simple as to make the balance of risk and utility too obvious for trial. The reasoning accords with the conclusions of one dissenter in *Todd*, who observed:

> "[I]njury seems inevitable and the issue is whether it is properly part of the cost of manufacture or better borne by the victim. The point of strict products liability, after all, is 'to minimize the costs of accidents and to consider who should bear those costs.' Note, *Strict Products Liability and the Risk-Utility Test for Design Defect: An Economic Analysis*, 84 Colum. L. Rev. 2045, 2049-50 (1984) (quoting *Suter v. San Angelo Foundry & Mach. Co.*, 81 N.J. 150, 406 A.2d 140, 151 (1979))." *Todd*, 21 F.3d at 1413 (Cudahy, J., dissenting).

The reasoning of *Miller* also accords with the opinion of two supreme court justices as advanced in *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78 (2005). In that case our supreme court held that the defendant failed to preserve for review an issue concerning the appropriate standard of care for a claim of negligent design, and the trial court should not have given the jury a special interrogatory concerning the obviousness of the danger. However, Justice Thomas expounded at length on tort law concerning strict products liability, in a portion of his opinion the majority of the court considered *dicta*. See *Blue*, 215 Ill. 2d at 114-20 (Freeman, J., specially concurring; Fitzgerald, J., specially concurring, joined by McMorrow, J.; Kilbride, J., concurring in part and dissenting in part). Justice Thomas accepted *Scoby* as authority that some simple products present such obvious dangers that the court need not apply the risk-utility balancing test. As he explained:

> "In strict products liability cases, the open and obvious nature of the risk is just one factor to be considered in the range of considerations required by the risk-utility test, and it will only serve to bar the liability of the manufacturer where it outweighs all other factors to be considered in weighing the inherent design risks

against the utility of the product as manufactured." *Blue*, 215 Ill. 2d at 103.

That is, the simplicity of the product, and its obvious danger, will not warrant summary judgment for the product's designer unless the balance of all considerations so clearly favors the defendant that no reasonable jury could find for the plaintiff. See *Miller*, 352 Ill. App. 3d at 664.

■ Here, the utility of the Aim 'n Flame design does not outweigh the risks of that design so obviously that no genuine issue of fact remains for trial. According to the evidence the estate presented, a modification costing only a few cents per unit could very substantially reduce the risk of children accidentally starting fires. The estate also presented evidence of the terrible social costs of the fires started by children playing with lighting rods, while case law shows the appalling social costs of fires children started by playing with cigarette lighters. *E.g.*, *Robins*, 80 S.W.3d at 645-46. Unlike a sheaf for every knife, or a protective lid for every vat, the proposed child-resistant features would not have an obvious effect on efficient use of the lighting rod.

Susan here attempted to reduce the risk of fire by storing the lighting rod in a cabinet children could not readily access. Another parent took a similar precaution in *Welch v. Scripto-Tokai Corp.*, 651 N.E.2d 810 (Ind. App. 1995), placing a cigarette lighter on a shelf so high she needed a footstool to reach it. But in *Welch* a three-year-old child found a way to get the lighter from the high shelf. While playing with the lighter the child lit his pajamas on fire, and he suffered severe injuries. Although the manufacturer could have substantially reduced the risk of such fires by making the lighter child-resistant, the court preferred to place the burden of the entire loss on the parent, without explaining how the parent could better have reduced the risk of such loss. *Welch*, 651 N.E.2d at 814-15.

Jillian's estate presented sufficient evidence to show that the risks of the lighting rod designed without child resistant features outweighed the benefits of that design. Under *Miller*, this evidence shows that the lighting rod does not qualify as the kind of especially simple device for which the result of the risk-utility balancing is too obvious for trial. Tokai and Scripto-Tokai have not shown sufficient grounds to avoid application of the general rule that the court should consider both consumer expectations and risks and utilities of the product's design to determine whether the design makes the product unreasonably dangerous.

Persuasive decisions from other states have similarly applied common law risk-utility balancing to determine the extent of a manufacturer's strict liability for producing cigarette lighters. See *Perkins v.*

*Wilkinson Sword, Inc.*, 83 Ohio St. 3d 507, 700 N.E.2d 1247 (1998); *Hernandez v. Tokai Corp.*, 2 S.W.3d 251 (Texas 1999); *Price v. BIC Corp.*, 142 N.H. 386, 702 A.2d 330 (N.H. 1997). The cases Tokai and Scripto-Tokai cite, including *Welch, Todd*, and *Jennings v. BIC Corp.*, 181 F.3d 1250 (11th Cir. 1999), give no persuasive reason for leaving the entire burden of fire loss on the plaintiffs, when Tokai could so readily reduce the risk of such loss, without adverse effect on the efficient use of the lighting rod. Accordingly, we reverse the judgment entered in favor of Tokai and Scripto-Tokai on the strict liability claim for defective design.

■ The trial court apparently relied on the simplicity of the product as grounds for granting Tokai and Scripto-Tokai summary judgment on the negligence counts. Under several of the opinions in *Blue*, risk-utility analysis and its simple products exception does not apply to negligent design cases. See *Blue*, 215 Ill. 2d at 103, at 115 (Freeman, J., specially concurring), at 119-20 (Kilbride, J., concurring in part and dissenting in part). After our supreme court issued *Blue*, we asked the parties to comment on the distinction drawn, in the opinion of two of the justices, between negligence and strict liability for product design. See *Blue*, 215 Ill. 2d at 101-03. Tokai and Scripto-Tokai argue that Jillian's estate, Fox and Loyola failed to plead a deviation from the appropriate standard of care, as required for a negligent design case. Tokai and Scripto-Tokai did not raise this issue in their motion for summary judgment. To permit the estate, Fox and Loyola to address this new issue, we reverse the summary judgment granted in favor of Tokai and Scripto-Tokai on the claim for negligent design and remand for further proceedings as to this issue.

■ Finally, Tokai and Scripto-Tokai ask us to affirm the decision insofar as it pertains to claims for failure to warn. We find no argument in the briefs of Jillian's estate, Fox and Loyola concerning the failure to warn. The parties have not explained how any further warnings could have helped Jillian, as Susan understood the danger and took measures to prevent the children from reaching the lighting rod. The estate does not suggest what further steps Susan would have or could have taken if the lighting rod also bore a warning that children as young as three years old could operate the device. The manufacturer has no duty to add pointless warnings about dangers the consumer already recognizes. *Sollami v. Eaton*, 201 Ill. 2d 1, 10 (2002). Accordingly, we affirm the summary judgment in favor of Tokai and Scripto-Tokai insofar as the judgment relates to claims for failure to warn of the danger of the lighting rod.

*Lamkin* states the law applicable to this case. Because the lighter here is no more simple than the screen at issue in *Lamkin*, Tokai and

Scripto-Tokai have not presented adequate grounds for deviating from the general rule that the court should look at both consumer expectations and the balance of risks against utilities to determine whether a product's design is unreasonably dangerous. But Jillian's estate, Fox and Loyola present no grounds for finding Tokai and Scripto-Tokai liable for failure to warn of the dangers. We affirm the summary judgment in favor of Tokai and Scripto-Tokai insofar as the judgment pertains to claims for failure to warn, but we reverse insofar as the judgment pertains to claims for strict liability and negligence based on defective design.

Affirmed in part and reversed in part; cause remanded.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.