Docket No. 101089.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

SUSAN CALLES, Independent Adm'r of the Estate of Jillian Calles, Deceased, and Indiv., Appellee, v. SCRIPTO-TOKAI CORPORATION *et al.*, Appellants (Richard Fox *et al.*, Appellees).

*Opinion filed February 16, 2007.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Justices Freeman, Fitzgerald, and Garman concurred in the judgment and opinion.

Justice Karmeier specially concurred, with opinion.

Chief Justice Thomas and Justice Kilbride took no part in the decision.

## OPINION

In Illinois, two tests are employed when determining whether a product is unreasonably dangerous under a strict liability design-defect theory–the consumer-expectation test and the risk-utility test. In this case, we are asked to consider whether there is a "simple product" exception to the application of the risk-utility test. That is, we must decide whether a product which is deemed "simple" and its dangers "open and obvious" will be *per se* exempt from the risk-utility test and

subject only to the consumer-expectation test. We decline to adopt such a *per se* rule.

## BACKGROUND

On March 31, 1998, plaintiff Susan Calles resided with her four daughters, Amanda, age 11, Victoria, age 5, and Jenna and Jillian, age 3. At some point that night, Calles left her home with Victoria to get videos for Amanda. When she left, the twins were in bed and Amanda was watching television. Calles returned to find fire trucks and emergency vehicles around her home. It was subsequently determined by a fire investigator, Robert Finn, that Jenna had started a fire using an Aim N Flame utility lighter Calles had purchased approximately one week earlier. The Aim N Flame was ignited by pulling a trigger after an "ON/OFF" switch was slid to the "on" position. As a result of the fire, Jillian suffered smoke inhalation. She was hospitalized and died on April 21.

Calles, individually and as administrator of Jillian's estate, filed suit in the circuit court of Cook County against Tokai, designer and manufacturer of the Aim N Flame, and Scripto-Tokai, distributor (collectively Scripto), alleging that the Aim N Flame was defectively designed and unreasonably dangerous because it did not contain a child-resistant safety device. According to the complaint, a safety device was available, inexpensive, and would have reduced the risk that children could ignite the lighter. Calles' claims sounded in strict liability, negligence, and breach of the implied warranties of merchantability and fitness for a particular purpose.[1] Calles further alleged that Scripto was negligent and strictly liable because of a failure to give adequate warnings.

---

[1]The only counts at issue here are the strict liability and negligent-product-design claims. Calles abandoned the breach of warranty claims by failing to argue for reversal of summary judgment before the appellate court. Although Calles appealed the trial court's order granting summary judgment in favor of Scripto in general, she presented no argument to the appellate court in connection with the breach of warranty claims. Therefore, she has forfeited these claims from any further challenge. Accordingly, we do not address the breach of warranty claim.

Calles also filed a medical malpractice claim against Dr. Richard Fox and Loyola University Medical Center (collectively Loyola) in connection with their treatment of Jillian following the fire. Scripto filed counterclaims against Calles and Loyola. Loyola then filed a counter-complaint for contribution against Scripto.

Thereafter, Scripto filed a motion for summary judgment on the claims brought by Calles and Loyola. Scripto argued that: (1) the Aim N Flame was not defective or unreasonably dangerous because it worked as expected; (2) Scripto had no duty to make an adult product child resistant; (3) Scripto had no duty to warn because the dangers of the Aim N Flame were open and obvious; and (4) there was no breach of warranties because the Aim N Flame operated as intended and expected.

In support of its motion for summary judgment, Scripto offered the deposition testimony of Calles and Robert Finn, the fire inspector. In her deposition, Calles admitted she was aware of the risks and dangers presented by lighters in the hands of children, and, for this reason, she stored the Aim N Flames on the top shelf of her kitchen cabinet. Calles further admitted that the Aim N Flame operated as intended and expected.

In opposition to Scripto's motion for summary judgment, Calles offered affidavits from several experts including John Geremia, a chemical and mechanical engineer; Tarald Kvålseth, a mechanical and industrial engineer; William Kitzes, a board-certified product safety manager; Richard Dahlquist, an electrical engineer; and Carol Pollack-Nelson, an engineering psychologist. All of these experts opined that the Aim N Flame was defective and unreasonably dangerous because it lacked a child-resistant design. They also opined that a technologically and economically feasible alternative design, which included a child-resistant safety device, existed at the time the Aim N Flame was manufactured. Several of the experts averred that Scripto was aware of the desirability of a child-safety device because it knew children could operate the Aim N Flame. Further, according to these experts, Scripto owned the technology to make the Aim N Flame child resistant in 1994 and 1995.

With respect to the cost of an alternative design, Kvålseth noted that the Consumer Product Safety Commission, the regulatory body for lighters, in a proposed rule dated September 30, 1998, estimated

the increased cost of adding a safety device to the lighter would be $0.40 per unit. However, it was Kvålseth's opinion that, had the feature been incorporated into the original design, the cost would have been negligible.

Calles also offered evidence of the dangerousness of lighters in the hands of children and Scripto's awareness of such dangers. She introduced into evidence statistics showing the number of previous fires started by children with lighters (both utility and cigarette), the number of deaths and injuries that had occurred each year as a result of fires started by children, and the reduction in cost to society that would be derived from the addition of child-resistant safety devices on the lighters. Calles further pointed to Scripto's answers to interrogatories, in which Scripto admitted they had been named as defendants in 25 lawsuits filed between 1996 and 2000 for injuries that occurred between 1992 and 1999 under circumstances similar to this case.

The trial court granted summary judgment in favor of Scripto on both Calles' complaint and Loyola's counter-complaint. The trial court found that all claims "must fall because these defendants neither owed nor breached any duty imposed upon them by law" under any of the causes of action raised.

On appeal, the appellate court affirmed in part and reversed in part.[2] 358 Ill. App. 3d 975. With respect to strict liability, the appellate court held that the Aim N Flame "does not qualify as the kind of especially simple device for which the result of the risk-utility balancing is too obvious for trial." 358 Ill. App. 3d at 983. Accordingly, the appellate court reversed the trial court's grant of summary judgment in favor of Scripto. 358 Ill. App. 3d at 984. The appellate court also reversed summary judgment on the negligent-design claims and remanded for further proceedings. 358 Ill. App. 3d

---

[2]The appellate court affirmed summary judgment in favor of Scripto "insofar as the judgment relates to claims for failure to warn." 358 Ill. App. 3d at 984. We note that the "failure to warn" was not a separate count but rather part of the allegations under each of the other counts (strict liability, negligence, and breach of warranty) serving as a basis to impose liability upon Scripto. No arguments are raised before us in connection with the propriety of the appellate court's holding and, thus, we need not address it.

at 984. We granted Scripto's petition for leave to appeal. 210 Ill. 2d R. 315.

Analysis

*Strict Liability*

In *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 622-23 (1965), this court adopted the strict liability doctrine set forth in section 402A of the Second Restatement of Torts. Under this doctrine, strict liability is imposed upon a seller of "any product in a defective condition unreasonably dangerous to the user or consumer or to his property." Restatement (Second) of Torts §402A, at 347-48 (1965). The test outlined in section 402A for determining whether a product is "unreasonably dangerous" is known as the consumer-expectation or consumer-contemplation test. This test provides that a product is "unreasonably dangerous" when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts §402A, Comment *i*, at 352 (1965).

Under the consumer-expectation test, a plaintiff must establish what an ordinary consumer purchasing the product would expect about the product and its safety. This is an objective standard based on the average, normal, or ordinary expectations of the reasonable person; it is not dependent upon the subjective expectation of a particular consumer or user. See American Law of Products Liability 3d §17:24, at 17–44 (1997); L. Bass, Products Liability: Design & Manufacturing Defects §4:1 (2d ed. 2001); *Britton v. Electrolux Home Products, Inc.*, No. CIV–05–1322–F (W.D. Okla. October 13, 2006); *Crosswhite v. Jumpking, Inc.*, 411 F. Supp. 2d 1228, 1232 (D. Or. 2006); *Henrie v. Northrop Grumman Corp.*, No. 2:04–CIV–00296 (D. Utah April 24, 2006). See also 1 D. Owens, M. Madden & M. Davis, Madden & Owens on Products Liability §5:6, at 294–5 (3d ed. 2000).

The consumer-expectation test was originally applied to manufacturing defects, but soon came to be applied to design-defect issues as well. Over time, the applicability of the consumer-expectation test to design-defect cases was questioned, primarily

because it became apparent that consumers might not be aware of what to expect regarding the safety of certain products. See *Barker v. Lull Engineering Co.*, 20 Cal. 3d 413, 427-28, 573 P.2d 443, 452-53, 143 Cal. Rptr. 225, 234-35 (1978). Accordingly, this court in *Lamkin v. Towner*, 138 Ill. 2d 510, 528 (1990), adopted a second, alternative test for design defect cases known as the risk-utility, or risk-benefit, test. See *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 91 (2005) (noting this court "understood the problem[s associated with application of the consumer-expectation test to design-defect cases] and recognized a second, alternative test").

In *Lamkin*, this court held that a plaintiff may demonstrate a product has been defectively designed "in one of two ways." One way a plaintiff may demonstrate a design defect is to present evidence that the product fails to satisfy the consumer-expectation test. Alternatively, a plaintiff may demonstrate a design defect by presenting evidence that the risk of danger inherent in the challenged design outweighs the benefits of such design. *Lamkin*, 138 Ill. 2d at 529; *Blue*, 215 Ill. 2d at 98-99.

The rationale for employing two tests was explained in *Barker*. There, the court noted that "at a minimum a product must meet ordinary consumer expectations as to safety to avoid being found defective." (Emphases omitted.) *Barker*, 20 Cal. 3d at 426 n.7, 573 P.2d at 451 n.7, 143 Cal. Rptr. at 233 n.7. However, "the expectations of the ordinary consumer cannot be viewed as the exclusive yardstick for evaluating design defectiveness because '[i]n many situations ... the consumer would not know what to expect, because he would have no idea how safe the product could be made.' [Citation.]" *Barker*, 20 Cal. 3d at 430, 573 P.2d at 454, 143 Cal. Rptr. at 236. Thus, even if a product satisfies ordinary consumer expectations, "if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design," a product may be found defective in design. *Barker*, 20 Cal. 3d at 430, 573 P.2d at 454, 143 Cal. Rptr. at 236. See also *Soule v. General Motors Corp.*, 8 Cal. 4th 548, 567, 882 P.2d 298, 308, 34 Cal. Rptr. 2d 607, 617 (1994) (refining *Barker* test and holding that the "consumer expectations test is reserved for cases in which the everyday

experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions," (emphases omitted) but that "the risks and benefits of a challenged design must be carefully balanced whenever the issue of design defect goes beyond the common experience of the product's users").

Since *Lamkin*, this court has continued to employ these two tests when determining whether a product is unreasonably dangerous. See *Blue*, 215 Ill. 2d at 91-92 (noting there are two, alternative tests in Illinois for proving a strict liability design defect claim); *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 433-38 (2002) (separately analyzing whether an IV catheter connector was unreasonably dangerous under the consumer-expectation and risk-utility tests). We now turn to them.

Consumer-Expectation Test

As noted above, under the consumer-expectation test, a plaintiff may prevail if he or she demonstrates that the product failed to perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. In the case at bar, there is a threshold question. Whose expectations control, *i.e.*, the adult purchaser or the child user? Calles argues we must apply the consumer-expectation test from the point of view of a child. We disagree.

For purposes of the consumer-expectation test, "ordinary" modifies consumer. Ordinary means "[r]egular; usual; normal; common." Black's Law Dictionary 989 (5th ed. 1979). See also 1 Madden & Owen on Products Liability §8:3, at 71 (Supp. 2006) (ordinary consumer "applies to the customary or usual consumer of the product"). See also *Swix v. Daisy Manufacturing Co.*, 373 F.3d 678, 686 (6th Cir. 2004) (" '[t]he focus is the *typical user's* perception and knowledge' [citation]" (emphasis added)). Several courts in other jurisdictions have held that the "ordinary consumer" of a lighter is an adult, not a child. See, *e.g.*, *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 263 (4th Cir. 1998) (applying South Carolina law); *Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1425 (E.D. Tenn. 1991), *aff'd*, 966 F.2d 1451 (6th Cir. 1992); *Kelley v. Rival Manufacturing Co.*, 704 F. Supp. 1039, 1043 (W.D. Okla. 1989); *Welch v. Scripto-Tokai Corp.*, 651 N.E.2d

810, 814 (Ind. App. 1995); *Bellotte v. Zayre Corp.*, 116 N.H. 52, 54, 352 A.2d 723, 725 (1976). In light of these cases, we hold that the ordinary consumer of a lighter, such as the Aim N Flame here, is an adult–the typical user and purchaser. Therefore, the expectations regarding the Aim N Flame's use and safety must be viewed from the point of view of the adult consumer.

We now consider whether the Aim N Flame meets the consumer-expectation test. The purpose of a lighter, such as the Aim N Flame, is to produce a flame. See T. Peters & H. Carroll, *Playing with Fire: Assessing Lighter Manufacturers' Duties Regarding Child Play Lighter Fires*, 9 Loy. Consumer L. Rep. 339, 340 (1997). Clearly then, the ordinary consumer would expect that, when the trigger is pulled, a flame would be produced. Here, the Aim N Flame was not used in its intended manner, *i.e.*, by an adult. Thus, the question is whether it was used in a reasonably foreseeable manner. We find that it was.

An ordinary consumer would expect that a child could obtain possession of the Aim N Flame and attempt to use it. Thus, a child is a reasonably foreseeable user. Likewise, an ordinary consumer would appreciate the consequences that would naturally flow when a child obtains possession of a lighter. See M. Madden, *Products Liability, Products for Use by Adults, And Injured Children: Back to the Future*, 61 Tenn. L. Rev. 1205, 1222 (Summer 1994). Specifically, an ordinary consumer would expect that the Aim N Flame, in the hands of a child, could cause the result that occurred here–the starting of a fire that led to injury to a child. See, *e.g.*, *Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 242 (5th Cir. 2003) (Texas law); *Curtis*, 778 F. Supp. at 1430 (Tennessee law); *Bondie v. BIC Corp.*, 739 F. Supp. 346, 349 (E.D. Mich. 1990); *Williams v. BIC Corp.*, 771 So. 2d 441, 449-50 (Ala. 2000); *Welch*, 651 N.E.2d at 814; *Price v. BIC Corp.*, 142 N.H. 386, 390, 702 A.2d 330, 333 (1997); *Campbell v. BIC Corp.*, 154 Misc. 2d 976, 978, 586 N.Y.S.2d 871, 873 (1992); *Perkins v. Wilkinson Sword, Inc.*, 83 Ohio St. 3d 507, 513, 700 N.E.2d 1247, 1252 (1998); *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 258 (Tex. 1999).

Under the facts of this case, the Aim N Flame performed as an ordinary consumer would expect–it produced a flame when used in a reasonably foreseeable manner, *i.e.*, by a child. This leads to the

inescapable conclusion that the ordinary consumer's expectations were fulfilled. In other words, the Aim N Flame did not fail to perform as an ordinary consumer would expect when used in a reasonably foreseeable manner. Thus, as a matter of law, no fact finder could conclude that the Aim N Flame was unreasonably dangerous under the consumer-expectation test. Therefore, Calles cannot prevail under this theory.

This does not end our analysis however. Though the Aim N Flame satisfies the consumer-expectation test, it may, nonetheless, be deemed unreasonably dangerous under the risk-utility test.

Risk-Utility Test

Under the risk-utility test, a plaintiff may prevail in a strict liability design-defect case if he or she demonstrates that the magnitude of the danger outweighs the utility of the product, as designed. *Lamkin*, 138 Ill. 2d at 529. Stated differently, "[t]he utility of the design must therefore be weighed against the risk of harm created" and "[i]f the likelihood and gravity of the harm outweigh the benefits and utilities of the product, the product is unreasonably dangerous." 63A Am. Jur. 2d *Products Liability* §978, at 146-47 (1997).

Relying on *Scoby v. Vulcan-Hart Corp.*, 211 Ill. App. 3d 106 (1991), Scripto argues there is a "simple product" exception to the application of the risk-utility test. In other words, Scripto contends that, when a product is deemed "simple," the risk-utility test need not be employed. We disagree.

In *Scoby*, an individual was injured while working in a restaurant kitchen when he slipped and fell and his arm became submerged in hot oil contained in an open deep-fat fryer. *Scoby*, 211 Ill. App. 3d at 107. The plaintiff sued the fryer manufacturer, alleging a design defect, and argued for liability under the risk-utility test. *Scoby*, 211 Ill. App. 3d at 109. Relying on *Lamkin*, the manufacturer argued that, because the danger at issue was not "excessive," the risk-utility test should not be utilized. *Scoby*, 211 Ill. App. 3d at 111-12.

The *Scoby* court agreed with the defendant. *Scoby*, 211 Ill. App. 3d at 112. Noting that hot oil in a fryer was an open and obvious danger and that, for efficient kitchen operation, it was often necessary to keep a lid off the fryer, the *Scoby* court concluded:

"We do not deem that *Lamkin* or other cases applying aspects of the danger-utility test intend that all manufacturers *** should be subject to liability depending upon a trier of fact's balancing under that test ***. Somewhere, a line must be drawn beyond which the danger-utility test cannot be applied. Considering not only the obvious nature of any danger here but, also, the simple nature of the mechanism involved, we conclude the circuit court properly applied only the consumer-user contemplation test." *Scoby*, 211 Ill. App. 3d at 112.

Several appellate court decisions have followed *Scoby* in various situations giving rise to the so called "simple product" exception to the application of the risk-utility test. See *Miller v. Rinker Boat Co.*, 352 Ill. App. 3d 648, 664 (2004); *Mele v. Howmedica, Inc.*, 348 Ill. App. 3d 1, 19 (2004); *Bates v. Richland Sales Corp.*, 346 Ill. App. 3d 223, 234 (2004); *Wortel v. Somerset Industries, Inc.*, 331 Ill. App. 3d 895, 908 (2002); *Besse v. Deere & Co.*, 237 Ill. App. 3d 497, 501-02 (1992).

In support of their position that summary judgment was properly granted in their favor, Scripto also cites to *Todd v. Societe Bic, S.A.*, 21 F.3d 1402 (7th Cir. 1994), wherein the court applied the *Scoby* exception to facts very similar to those in the case at bar. In *Todd*, a two-year-old child died when a four-year-old child used a Bic lighter to start a fire in the two-year-old's bedroom. *Todd*, 21 F.3d at 1403. The plaintiff filed a strict liability design-defect claim against the manufacturer, alleging the lighter was unreasonably dangerous because it did not contain a child-resistant safety device. *Todd*, 21 F.3d at 1404. The district court granted summary judgment in favor of the manufacturer and the plaintiff appealed. *Todd*, 21 F.3d at 1405. The Seventh Circuit Court of Appeals affirmed, concluding that the lighter was not unreasonably dangerous under the consumer-expectation test because it performed exactly as a consumer would expect–it produced a flame when activated. *Todd*, 21 F.3d at 1407.

The *Todd* court then observed that this court had adopted a second test in strict liability design-defect cases, the risk-utility test. The court also observed, however, that in *Scoby*, a simple-product exception to application of this test had been adopted. *Todd*, 21 F.3d at 1410-11. Noting that this court had not yet addressed the *Scoby*

exception, the *Todd* court opined that this court "would not apply the risk-utility test to simple but obviously dangerous products." *Todd*, 21 F.3d at 1412. The *Todd* court then concluded the lighter was a simple product and, for that reason, the risk-utility test was not applicable. *Todd*, 21 F.3d at 1412.

While this court has made reference to *Scoby* in past decisions, we have never had occasion to squarely address the simple-product exception it adopted. See *Blue*, 215 Ill. 2d at 108; *Hansen*, 198 Ill. 2d at 437. We do so now.

Upon close examination of *Scoby*, we find that it uses "simple" and "open and obvious" as separate components. However, in our view, the dangers associated with a product that is deemed "simple" are, by their very nature, open and obvious. See, *e.g.*, *Swix*, 373 F.3d at 684-85 (finding "that the fact that a product may be a 'simple tool' is not dispositive in a design defect case–the obviousness of a danger is merely one factor in the analysis of whether the risks are unreasonable in light of the foreseeable injuries"). We conclude, then, that *Scoby*'s adoption of a "simple product" exception is nothing more than the adoption of a general rule that a manufacturer will not be liable for open and obvious dangers.

A majority of courts have rejected the notion that the open and obvious danger of a product is an absolute defense to a defective-design claim in strict liability. Restatement (Third) of Torts: Products Liability §2, Reporters' Note, Comment *d*, at 84-85 (1998) (identifying 25 jurisdictions that have rejected a *per se* rule). See also American Law of Products Liability 3d §28:82, at 28–108 (1997); 61 Tenn. L. Rev. at 1227-28. We, too, recognized this principle in *Blue*, when this court stated:

> "In strict products liability cases, the open and obvious nature of the risk is just one factor to be considered in the range of considerations required by the risk-utility test, and it will only serve to bar the liability of the manufacturer where it outweighs all other factors to be considered in weighing the

inherent design risks against the utility of the product as manufactured." *Blue*, 215 Ill. 2d at 103.[3]

Moreover, this court noted that such a ruling appeared to be consistent with Illinois law. *Blue*, 215 Ill. 2d at 103, citing *Coney v. J.L.G. Industries, Inc.*, 97 Ill. 2d 104, 119 (1983) (assumption of risk is not a bar to recovery in strict liability). See also *Miller*, 352 Ill. App. 3d at 661; *Wortel*, 331 Ill. App. 3d at 902. As one case has held, the obviousness of a risk inherent in a product, *simple or nonsimple*, does not by itself obviate a manufacturer's liability. *Cacevic v. Simplimatic Engineering Co.*, 241 Mich. App. 717, 725, 617 N.W.2d 386, 390 (2000), *vacated in part*, 463 Mich. 997, 625 N.W.2d 784 (2001).

Policy reasons also support rejection of a *per se* rule excepting simple products with open and obvious dangers from analysis under the risk-utility test. Adoption of such a rule would essentially absolve manufacturers from liability in certain situations even though there may be a reasonable and feasible alternative design available that would make a product safer, but which the manufacturer declines to incorporate because it knows it will not be held liable. This would discourage product improvements that could easily and cost-effectively alleviate the dangers of a product. A *per se* rule would also frustrate the policy of preventing future harm which is at the heart of strict liability law. See 1 Madden & Owens on Product Liability §8:3, at 447 (noting that the consumer-expectation test limited by the open and obvious doctrine "perniciously rewards manufacturers for failing to adopt cost-effective measures to remedy obviously unnecessary dangers to human life and limb"); Restatement (Third) of Torts: Products Liability §2, Comment *a*, at 16 (1998) (strict liability for design defects creates "incentives for manufacturers to achieve optimal levels of safety in designing and marketing products"); Restatement (Third) of Torts: Products Liability §2, Reporters' Note, Comment *a*, at 40 (1998) (strict liability "promotes investment in product safety").

---

[3] Although there were three separate opinions in *Blue*, involving four members of this court, no justice disagreed with the proposition that an open and obvious danger is not an absolute bar to a strict liability design-defect claim.

Accordingly, we hold that the open and obvious danger of a product does not create a *per se* bar to a manufacturer's liability, nor does it preclude application of the risk-utility test. Rather, the open and obvious nature of a danger is one factor that may be weighed in the risk-utility test. *Blue*, 215 Ill. 2d at 103. See also Restatement (Third) of Torts: Products Liability §2, Reporters' Note, Comment *d*, at 85 (1998). We reject *Scoby*'s adoption of a *per se* rule excepting simple products with open and obvious dangers from analysis under the risk-utility test. Accordingly, we reject Scripto's assertion that only the consumer-expectation test applies here. We now consider whether Calles presented sufficient evidence under the risk-utility test to withstand summary judgment.

Under the risk-utility test, a court may take into consideration numerous factors. In past decisions, this court has held that a plaintiff may prove a design defect by presenting evidence of "the availability and feasability of alternate designs at the time of its manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation." *Anderson v. Hyster Co.*, 74 Ill. 2d 364, 368 (1979). See also *Hansen*, 198 Ill. 2d at 436 (feasibility of alternative design relevant); *Moehle v. Chrysler Motors Corp.*, 93 Ill. 2d 299, 304 (1982) (evidence of compliance with governmental regulations relevant in design defect cases to determine whether a product is unreasonably dangerous); *Rucker v. Norfolk & Western Ry. Co.*, 77 Ill. 2d 434, 436-39 (1979) (same); *Kerns v. Engelke*, 76 Ill. 2d 154, 162-63 (1979) (feasibility of alternative design relevant). Although all of these cases, except *Hansen*, preceded the adoption of the risk-utility test in Illinois, we find the factors set forth in these cases are relevant when engaging in risk-utility analysis. See *Blue*, 215 Ill. 2d at 92 (noting the rationale of *Anderson* "appears to partially set forth the risk-utility test").

John W. Wade, dean and professor of law, emeritus, Vanderbuilt University School of Law, has also identified several factors relevant when engaging in risk-utility analysis. These factors include:

> "(1) The usefulness and desirability of the product-its utility to the user and to the public as a whole.

(2) The safety aspects of the product-the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance." J. Wade, *On The Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 837-38 (1973).

Wade's factors have been adopted and relied upon by numerous jurisdictions, including our own appellate court. See *LaBelle v. Philip Morris, Inc.*, 243 F. Supp. 2d 508, 515 n.4 (D. S.C. 2001); *Nemir v. Mitsubishi Motors Sales Corp. of America*, 60 F. Supp. 2d 660, 674 (E.D. Mich. 1999), *aff'd in part, rev'd in part*, 6 Fed. App'x 266 (6th Cir. 2001); *Dart v. Wiebe Manufacturing, Inc.*, 147 Ariz. 242, 245-46, 709 P.2d 876, 879-80 (1985); *Armentrout v. FMC Corp.*, 842 P.2d 175, 184 n.10 (Colo. 1992); *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 213 n.10, 694 A.2d 1319, 1330 n.10 (1997); *Tabieros v. Clark Equipment Co.*, 85 Haw. 336, 366, 944 P.2d 1279, 1309 (1997); *Wortel*, 331 Ill. App. 3d at 904; *Banks v. Iron Hustler Corp.*, 59 Md. App. 408, 425-26 & n.3, 475 A.2d 1243, 1252 & n.3 (1984); *Nunnally v. R.J. Reynolds Tobacco Co.*, 869 So. 2d 373, 379-80 (Miss. 2004); *Duke v. Gulf & Western Manufacturing Co.*, 660 S.W.2d 404, 411-12 (Mo. App. 1983); *Johansen v. Makita U.S.A., Inc.*, 128 N.J. 86, 96, 607 A.2d 637, 642-43 (1992); *Duran v. General Motors Corp.*, 101 N.M. 742, 747, 688 P.2d 779, 784 (App. 1983); *Rainbow v. Albert Elia Building Co.*, 79 A.D.2d 287, 291 n.2, 436 N.Y.S.2d 480, 483 n.2 (1981), *aff'd*, 56 N.Y.2d 550, 449

N.Y.S.2d 967, 434 N.E.2d 1345 (1982); *Roach v. Kononen/Ford Motor Corp.*, 269 Or. 457, 464, 525 P.2d 125, 128-29 (1974); *Phatak v. United Chair Co.*, 756 A.2d 690, 694 (Pa. Super. 2000); *Ray v. BIC Corp.*, 925 S.W.2d 527, 532, 533 n.10 (Tenn. 1996).

Lastly, we find that when assessing the utility of a product, the following factors may also be relevant: "(1) the appearance and aesthetic attractiveness of the product; (2) its utility for multiple uses; (3) the convenience and extent of its use, especially in light of the period of time it could be used without harm resulting from the product; and (4) the collateral safety of a feature other than the one that harmed the plaintiff." American Law of Products Liability 3d §28:19, at 28–30 through 28–31 (1997).

Although we have listed a number of factors which courts may consider when assessing risk-utility, we do not mean to imply that the list is exclusive. The factors cited merely illustrate those that may assist a court and jury in evaluating whether a design is unreasonably dangerous. A plaintiff need not present proof on each of the factors. In the first instance, the court must balance factors it finds relevant to determine if the case is a proper one to submit to the jury. Restatement (Third) of Torts: Products Liability §2, Reporters' Notes, Comment *e*, at 94 (1998). Once this threshold determination has been met, it is up to the fact finder to determine the importance of any particular factor, and its "relevance, and the relevance of other factors, will vary from case to case." See Restatement (Third) of Torts: Products Liability §2, Comment *f*, at 23 (1998). We now apply those factors identified above to the evidence presented in the case at bar.

After reviewing the evidence presented, we find the only factor which favors Calles and a finding of unreasonably dangerous is the second Wade factor–safety aspects. Calles presented specific and detailed evidence as to the likelihood of injury and the seriousness of injury from lighters which do not have child-safety devices.

Factors which would favor Scripto and a finding that the product is not unreasonably dangerous are the first and sixth Wade factors–the utility of the Aim N Flame and the user's awareness of the dangers. As to the utility of the Aim N Flame, it is both useful and desirable to society as a whole–it serves as an inexpensive alternative source of fire. Moreover, compared to other sources of fire, such as matches, it is more convenient and longer lasting since it is a multiuse product.

The lighter may also be safer since it will extinguish if dropped on the floor while lit, unlike a match. With respect to the user's awareness of the dangers, there is no question, based on Calles' deposition testimony, that it was obvious to her that the lighter could come into the hands of a child and the dangers and risks that situation would pose.

In connection with the remaining relevant factors, we find that these neither weigh for nor against a finding of unreasonably dangerous. Calles claims that a substitute product was available, but the only evidence she relies upon is the fact Bic introduced a child-resistant utility lighter in March 1998, the very same month of the incident here. This is insufficient to demonstrate that a substitute product was available at the time of the manufacture of the Aim N Flame.

Calles offered expert affidavits regarding the availability and feasibility of an alternative design, including product impairment and cost factors, along with industry standards. Each expert opined, in a conclusory fashion, that a feasible alternative design existed. Kvålseth identified three alternative designs.

Scripto argues that, although Kvålseth set forth these alternative designs, he failed to give a basis for his feasability determination, nor did he show that these alternative designs met regulatory standards. In this regard, Scripto notes that the Consumer Product Safety Commission (CPSC), the regulatory body for these products, required safety devices on cigarette lighters beginning in 1994, but exempted utility lighters. It was not until 1999 that CPSC required safety devices on utility lighters. See, *e.g.*, *Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1117 (D. Colo. 2000). CPSC exempted utility lighters because it was concerned about "flashbacks" (the build up of gas and resultant sudden flash when a lighter was not ignited properly). Specifically, CPSC feared that if a child-resistant device on a utility lighter needed to be reset between attempts, this could cause a delay in ignition, resulting in the increased risk of flashback. Scripto maintains that this concern shows that some of the child-resistant options proffered by Kvålseth in his affidavit were not, in fact, feasible. Scripto also disputes Calles' claim that there would be no impairment to the Aim N Flame from modification with a child-

resistant safety device since she cites no evidence in support of her argument.

With respect to the cost feasability, Calles offered evidence through Kvålseth's affidavit. According to Kvålseth,

> "the CPSC [Consumer Product Safety Commission] in the Proposed Rule dated September 20, 1998, has estimated that the rule will likely increase the cost of manufacturing utility lighters by about $0.40 per unit. The defendants have indicated that such a cost increase would only be a few cents per lighter. However, had a utility lighter *** been originally designed to be effectively child resistant, *** then the incremental cost due to an effective child-resistancy feature would have been negligible."

There is nothing in our record showing Scripto provided any amount as to the increase in cost of incorporating a safety device. Apparently, according to Loyola, this information was offered into evidence in *Flock*, 319 F.3d 231, where an internal Scripto memorandum authored in 1996 estimated cost increase would be $0.03 per unit. In light of the foregoing, we conclude that a material issue of fact exists on the question of whether there was a feasible alternative design available, which cannot be determined on the basis of the record as it currently stands.

Lastly, with respect to the user's ability to avoid the danger, Calles testified she put the Aim N Flames on the top shelf of her kitchen cabinet. However, she also acknowledged she could have left them on the counter. As Scripto maintains, the appellate court embraced the former testimony, despite contradictory evidence. This is a factual determination we cannot make.

Based on a review of the foregoing factors, reasonable persons could differ on the weight to be given the relevant factors, particularly where additional proofs are necessary, and thus could differ on whether the risks of the Aim N Flame outweigh its utility. Therefore, reasonable persons could differ as to whether the Aim N Flame is unreasonably dangerous, and we cannot say that Scripto was entitled to judgment as a matter of law. As such, we affirm the appellate court's decision reversing the trial court's decision granting summary judgment in favor of Scripto on the strict liability claims.

*Negligence Claim*

The next question we must decide is whether Scripto was entitled to summary judgment on the negligent-product-design claims.

The appellate court found that the trial court granted summary judgment in favor of Scripto on the basis of the simple-product exception. 358 Ill. App. 3d at 984. It then concluded that *Blue* held that the risk-utility test was not applicable to negligent-product-design claims. 358 Ill. App. 3d at 984. Based on this holding, the appellate court reversed summary judgment and remanded for further proceedings. We find that the appellate court erred in doing so.

There was no majority opinion in *Blue* holding that the risk-utility test was not applicable to negligent-product-design cases. Rather, as Justice Freeman pointed out, only three Justices (Thomas, Garman, and Kilbride) concurred in this conclusion. *Blue*, 215 Ill. 2d at 115 (Freeman, J., specially concurring). As such, the conclusion that the risk-utility test is not applicable in negligent-product-design cases is not binding precedent. Accordingly, we conclude that the appellate court erred in reversing summary judgment based on *Blue* and we must review anew the trial court's order that Scripto owed no duty, nor breached any duty owed.

A product liability action asserting a claim based on negligence, such as negligent design, falls within the framework of common law negligence. *Flaugher v. Sears, Roebuck & Co.*, 61 Ill. App. 3d 671, 675 (1978). Thus, a plaintiff must establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury that was proximately caused by that breach, and damages. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990). The key distinction between a negligence claim and a strict liability claim lies in the concept of fault. *Coney v. J.L.G. Industries, Inc.*, 97 Ill. 2d 104, 117 (1983). In a strict liability claim, the focus is on the condition of the product. *Coney*, 97 Ill. 2d at 117-18. However, in a negligence claim, a defendant's fault is at issue in addition to the condition of the product. *Coney*, 97 Ill. 2d at 117-18.

A manufacturer has a nondelegable duty to design reasonably safe products. *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill. 2d 176, 188 (1990), quoting *Savage Manufacturing & Sales, Inc. v. Doser*, 184 Ill. App. 3d 405, 410-11 (1989) (Jiganti, P.J., dissenting); *Coney*, 97 Ill. 2d at 117. The crucial question in a negligent-design

-18-

case is whether the manufacturer exercised reasonable care in the design of the product. American Law of Products Liability 3d §28:46, at 28-64 (1997); 63A Am. Jur. 2d *Products Liability* §953, at 130 (1997). See also Restatement (Second) of Torts §398, at 336 (1965) ("A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care").

In determining whether the manufacturer's conduct was reasonable, the question is "whether in the exercise of ordinary care the manufacturer should have foreseen that the design would be hazardous to someone." American Law of Products Liability 3d §28:48, at 28-66 (1997). See also 63A Am. Jur. 2d *Products Liability* §953, at 129 (1997) (a manufacturer has a "duty to design against reasonably foreseeable hazards"). To show that the manufacturer acted unreasonably based on the foreseeability of harm, the plaintiff must show the manufacturer knew or should have known of the risk posed by the product design at the time of manufacture. 63A Am. Jur. 2d *Products Liability* §942, at 120 (1997).

Scripto argues that if the Aim N Flame is not unreasonably dangerous for purposes of strict liability because of the open and obvious nature of the dangers associated with it, then the Aim N Flame is not unreasonably dangerous for purposes of negligent product design. Stated differently, Scripto maintains that, because of the patent nature of the danger, no duty exists on their part as a matter of law, and they are entitled to summary judgment.

We disagree with Scripto's argument for many of the reasons stated in connection with our discussion of the strict liability claim. The open and obvious nature of a danger is just one factor in evaluating whether a manufacturer acted reasonably in designing its product. It is not dispositive.

After reviewing the evidence presented here, we find that conflicting evidentiary facts were presented with respect to whether the design of the Aim N Flame was defective. We further find that conflicting evidentiary facts were presented in connection with foreseeability, *i.e.*, Scripto's knowledge of the potential risks posed by the Aim N Flame's design. Accordingly, we conclude that questions

of fact exist as to whether Scripto exercised reasonable care in the design and manufacture of the Aim N Flame, precluding summary judgment. For the reasons stated, we affirm the appellate court's reversal of summary judgment in favor of Scripto on the negligent product design claims.

## Conclusion

We find there is no *per se* rule excepting application of the risk-utility test where a product is deemed simple and its dangers are open and obvious. We also find that there are material questions of law and fact that preclude us from finding, as a matter of law, that the Aim N Flame was not unreasonably dangerous under the risk-utility test. For the reasons set forth above, we affirm the appellate court's reversal of summary judgment in favor of Scripto on the strict liability claims and on the negligent-product-design claims.

*Appellate court judgment affirmed.*

CHIEF JUSTICE THOMAS and JUSTICE KILBRIDE took no part in the consideration or decision of this case.

JUSTICE KARMEIER, specially concurring:

I agree with the majority summary judgment was improper in this case because material questions of fact exist as to whether there was a feasible alternative design available and whether Scripto exercised reasonable care in the design and manufacture of the Aim N Flame. With respect to the strict liability claim, I also agree that no reasonable fact finder could conclude that the Aim N Flame was unreasonably dangerous under the consumer expectation test. Regarding the risk-utility test, however, I disagree with the reasoning behind the majority's rejection of the simple-product exception. I would hold that whatever its merits, the exception has no application in this case because the Aim N Flame lighter is not a simple product. Consequently, the majority properly evaluates the plaintiff's claim under the risk-utility test.

-20-

In *Scoby v. Vulcan-Hart Corp.*, 211 Ill. App. 3d 106 (1991), the plaintiff was working in a restaurant kitchen when he slipped and fell, submerging his arm in hot oil contained in an open deep-fat fryer. *Scoby*, 211 Ill. App. 3d at 112. The plaintiff sued the fryer manufacturer, who argued that because the danger in question was not "excessive," the risk-utility test should not be utilized. *Scoby*, 211 Ill. App. 3d at 111-12. The *Scoby* court agreed, holding that where the danger at issue is open and obvious, and the mechanism in question is simple, the risk-utility test should not be used. *Scoby*, 211 Ill. App. 3d at 112-13.

The majority concludes that while *Scoby* used "simple" and "open and obvious" as separate components, the dangers associated with a "simple" product are, by their very nature, open and obvious. Consequently, the majority concludes that the simple-product exception set forth in *Scoby* is nothing more than the adoption of a general rule that a manufacturer will not be liable for open and obvious dangers, a position this court rejected in *Blue v. Environmental Engineering*, 215 Ill. 2d 78, 103 (2005).

I am not persuaded by the majority's reasoning. As the majority acknowledges, the *Scoby* court treated simplicity of the product and the openness and obviousness of the danger as separate elements. As envisioned by *Scoby*, the simple-product exception applies only when the product is simple *and* the dangers are open and obvious. In other words, under the simple-product exception, the openness and obviousness of a product's dangers will not *per se* preclude liability *unless the product is also a simple one*. The majority's view that the simple-product exception is nothing more than a general rule that a manufacturer will not be liable for open and obvious dangers essentially reads the "simple" component out of the simple-product exception. Consequently, the majority rejects the simple-product exception without ever addressing its merits.

Although I disagree with the majority's rejection of the simple-product exception, I would hold that it does not preclude application of the risk-utility test in this case because the Aim N Flame is not a simple product. Applying that test, I agree with the majority that there was sufficient evidence to raise a genuine material issue of fact with respect to the question of whether a feasible alternative design was

available. Consequently, summary judgement on the strict liability count was improper.